# IRON SILVER MINING COMPANY *v.* MIKE AND STARR GOLD AND SILVER MINING COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLORADO.

No. 2. Argued November 20, 23, 1891. — Decided February 29, 1892.

The term "known vein" Rev. Stat. § 2333 refers to a vein or lode whose existence is known, as contradistinguished from one which has been appropriated by location. The title to portions of a horizontal vein or deposit, generally called a "blanket vein," may be acquired under the sections of the Revised Statutes concerning veins, lodes, etc.

In ejectment for the possession of a mine, the plaintiff claimed under a placer patent, issued January 30, 1880, on an application made November 13, 1878, and entry and payment made February 21, 1879. The defendant claimed under a location certificate of a lode issued to one Goodell, dated March 10, and recorded March 11, 1879, reciting a location February 1, 1879. The defendant, to maintain its claim, offered the testimony of several witnesses, which established beyond any doubt that in 1877, and more than a year before any proceedings were initiated with reference to the placer patent, the grantors of defendant entered upon and ran a tunnel some 400 feet in length into and through that ground which afterwards was patented as the placer tract; and that in running such tunnel they intersected and crossed three veins, one of which was thereafter, and in 1879, located as the Goodell vein or lode. The vein thus crossed and disclosed by the tunnel was from seventy-five to seventy-eight feet from its mouth, of about fifteen inches in width, with distinct walls of porphyry on either side, a vein whose existence was obvious to even a casual inspection by any one passing through the tunnel. At the trial the court ruled that if the vein was known to the placer patentee at or before entry and payment, although not known at the time of the application for patent, it was excepted from the property conveyed. *Held,*

(1) That this vein was a known vein at the time of the application for the placer patent;

(2) That the plaintiff was bound to know of the existence of the tunnel, and what an examination of it would disclose;

(3) That it was a question for the jury whether there was sufficient gold or silver within the vein to justify exploitation, and to be properly a " known vein or lode" within the meaning of Rev. Stat. § 2333;

(4) That the time at which the vein or lode within the placer must be known in order to be excepted from the grant of the placer patent is the time at which the application for that patent was made; but that the plaintiff suffered no injury from the error in the instruction of the court below in that respect, as the facts which implied knowledge at the time of the entry and payment existed also at and before the date of the application;

(5) That the neglect of the parties who ran the tunnel to at once develop the vein was of no account, as it appeared that there was a prevalent belief that a rich blanket vein was underlying the entire country, and this was the object of pursuit by all;

(6) That the admission of evidence respecting that blanket vein was immaterial, as the attention of the jury was directed by the court to the vein disclosed by the tunnel as the known vein upon which the rights of defendant rested.

EJECTMENT. The plaintiff in error was plaintiff below, and claimed under a placer patent issued January 30, 1880, on an application made November 30, 1878, and entry and payment made February 21, 1879. The defendant claimed under a location certificate of a lode dated March 10, and recorded March 11, 1879, reciting a location February 1, 1879. This case was argued with No. 3 (*post*, 430) on the 25th and 26th of March, 1890; and on the 26th and 27th, No. 7 (*post*, 431) was argued. On the 10th of November, 1890, the court made the following order:

It is ordered that these cases be reargued before a full court, and then as one case. And the attention of counsel is specially directed to the discussion of the following questions:

*First.* What constitutes a "lode or vein" within the meaning of sections 2320 and 2333 of the Revised Statutes?

*Second.* What constitutes a "known lode or vein" within the meaning of section 2333?

*Third.* In what manner must the existence of such lode or vein be indicated to enable the applicant for a placer patent

to describe it, and tender the price for it per acre required by the government?

*Fourth.* Whether the existence of such lode or vein must be known, and its purchase applied for, when the application is made for the placer patent; and whether a lode or vein will be excluded from the patent, which is discovered after such application and before the patent is issued?

*Fifth.* Whether evidence of the existence of lodes or veins in the immediate vicinity of a placer claim is admissible to the jury, as tending to show the existence of such lode or vein within the boundaries of the claim? and

*Sixth.* Whether there was any legal evidence for the jury of the vein or lode claimed by the defendant in error in the first two cases, Nos. 6 and 7, [2 and 3] or by the plaintiffs in error in the third case, No. 16 [7]?

Counsel of the parties are requested to produce on the reargument models and diagrams showing the position and form of the placer claim of the plaintiff in error in Nos. 6 and 7, [2 and 3] and defendant in error in No. 16, [7] and the position in it of the alleged lodes of the defendant in error in Nos. 6 and 7, [2 and 3] and plaintiffs in error in No. 16, [7] and also of the tunnel alleged to run into the said claim, and also of the adjoining land so far as may be necessary to a full understanding of the questions involved.

The statutes referred to in this order and in the opinion of the court, *post*, will be found in the margin.[1] The three

---

[1] The court refers to the following sections of the Revised Statutes.

"SEC. 2320. Mining claims upon veins or lodes of quartz or other rock in place bearing gold, silver, cinnabar, lead, tin, copper or other valuable deposits heretofore located, shall be governed as to length along the vein or lode by the customs, regulations and laws in force at the date of their location. A mining claim located after the tenth day of May, eighteen hundred and seventy-two, whether located by one or more persons, may equal, but shall not exceed, one thousand five hundred feet in length along the vein or lode, but no location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located. No claim shall extend more than three hundred feet on each side of the middle of the vein at the surface, nor shall any claim be limited by any mining regulation to less than twenty-five feet on each side of the middle of the vein at the

cases were argued together in this court on the 20th and 23d of November, 1891, and the case made by the pleadings and arguments, in No. 2, as stated by the court was as follows:

---

surface, except where adverse rights existing on the tenth day of May, eighteen hundred and seventy-two, render such limitation necessary. The end lines of each claim shall be parallel to each other."

"SEC. 2325. A patent for any land claimed and located for valuable deposits may be obtained in the following manner: Any person, association or corporation authorized to locate a claim under this chapter, having claimed and located a piece of land for such purposes, who has, or have, complied with the terms of this chapter, may file in the proper land office an application for a patent, under oath, showing such compliance together with a plat and field-notes of the claim or claims in common, made by or under the direction of the United States Surveyor General, showing accurately the boundaries of the claim or claims, which shall be distinctly marked by monuments on the ground, and shall post a copy of such plat, together with a notice of such application for a patent, in a conspicuous place on the land embraced in such plat previous to the filing of the application for a patent, and shall file an affidavit of at least two persons that such notice has been duly posted, and shall file a copy of the notice in such land office, and shall thereupon be entitled to a patent for the land in the manner following: The register of the land office, upon the filing of such application, plat, field-notes, notices, and affidavits, shall publish a notice that such application has been made for the period of sixty days in a newspaper to be by him designated as published nearest to such claim, and he shall also post such notice in his office for the same period. The claimant at the time of filing this application, or at any time thereafter, within the sixty days of publication, shall file with the register a certificate of the United States Surveyor General that five hundred dollars' worth of labor has been expended on improvements made upon the claim by himself or grantors; that the plat is correct, with such further description by such reference to natural objects or permanent monuments as shall identify the claim, and furnish an accurate description, to be incorporated in the patent. At the expiration of the sixty days of publication the claimant shall file his affidavit, showing that the plat and notice have been posted in a conspicuous place on the claim during such period of publication. If no adverse claim shall have been filed with the register and the receiver of the proper land office at the expiration of the sixty days of publication, it shall be assumed that the applicant is entitled to a patent upon the payment to the proper officer of five dollars per acre, and that no adverse claim exists; and thereafter no objection from third parties to the issuance of a patent shall be heard, except it be shown that the applicant has failed to comply with the terms of this chapter."

"SEC. 2333. Where the same person, association or corporation is in possession of a placer claim, and also a vein or lode included within the boun-

On the 20th of February, 1885, plaintiff in error, plaintiff below, filed its complaint in the District Court of Lake County, Colorado, in which it alleged that on the 1st day of January, 1884, it was the owner and in possession of a certain tract of land, known as the William Moyer placer, consisting of 56.69 acres, the particular description of which was given; and that on the 1st day of December, 1884, the defendant wrongfully entered upon said premises, and ousted the plaintiff from possession thereof, and still wrongfully retained such possession. The defendant answered that the patent for said placer was issued on the 30th day of January, 1880, and contained the following reservation: "That the grant hereby made is restricted in its exterior limits to the boundaries of the said lot No. 300, as hereinbefore described, and to any veins or lodes of quartz or other rock in place bearing gold, silver, cinnabar, lead, tin, copper or other valuable deposits, which may have been discovered within said limits subsequent to the date hereof, and not claimed or known to exist at the date hereof. Second. That should any vein or lode of quartz or other rock in place bearing gold, silver, cinnabar, lead, tin, copper or other valuable deposits be claimed or known to exist within the above-described premises at the date hereof the same is expressly excepted and excluded from these presents."

It also alleged that at the time of the location of the placer

---

daries thereof, application shall be made for a patent for the placer claim, with the statement that it includes such vein or lode, and in such case a patent shall issue for the placer claim, subject to the provisions of this chapter, including such vein or lode, upon the payment of five dollars per acre for such vein or lode claim, and twenty-five feet of surface on each side thereof. The remainder of the placer claim, or any placer claim not embracing any vein or lode claim shall be paid for at the rate of two dollars and fifty cents per acre, together with all costs of proceedings; and where a vein or lode, such as is described in section twenty-three hundred and twenty, is known to exist within the boundaries of a placer claim, an application for a patent for such placer claim which does not include an application for the vein or lode claim shall be construed as a conclusive declaration that the claimant of the placer claim has no right of possession of the vein or lode claim; but where the existence of a vein or lode in a placer claim is not known, a patent for the placer claim shall convey all valuable mineral and other deposits within the boundaries thereof."

claim, and the survey thereof, and at the time of the application for the patent, there was a known lode, vein and deposit of mineral within the boundaries of said placer, called the Goodell lode, and that the patentee had knowledge of its existence. On the application of the plaintiff the case was removed to the Federal court, and there a replication was filed denying the existence of any known lode or vein at or before the issue of the patent. The case was tried before a jury in November, 1885, which trial resulted in a verdict and judgment for the defendant, and thereupon the plaintiff brought the case here on error.

*Mr. L. S. Dixon* and *Mr. Ashley Pond* for plaintiff in error. *Mr. James McKeen* and *Mr. Frank W. Owers* were on their brief.

*Mr. T. M. Patterson* for defendant in error.

Mr. Justice Brewer delivered the opinion of the court.

This and two kindred cases have been before us for consideration for some time. They have been twice argued, the reargument having been ordered by the court of its own motion; and on the second argument, at the like instance, very elaborate and complete models, maps and photographs were prepared by the respective parties and presented for our examination. The fact is, there was an earnest inquiry as to whether the court had not erred in its prior and repeated ruling, that a known lode, as named in section 2333 of the Revised Statutes, is something other than a located lode; and, also, whether, in view of the disclosures made in this, as in prior cases, of the existence of a body of mineral underlying a large area of country in the Leadville mining district, whose general horizontal direction, together with the sedimentary character of the superior rock, indicated something more of the nature of a deposit like a coal bed than of the vertical and descending fissure vein, in which silver and gold are ordinarily found, it did not become necessary to hold that the only pro-

visions of the statute under which title to any portion of this body of mineral, or the ground in which it is situated, can be acquired, are those with respect to placer claims. Of course, such conclusions would have compelled a revising of some former opinions, and have wrought great changes in the status of mining claims. in that district. Because of this we have been very careful, and the investigations in these directions have been earnest and protracted. It would serve no useful purpose to state all the arguments which have been advanced and considered by us. It is enough to announce the results. Our conclusions are, first, in respect to the matter of the known vein, that the reasons so clearly stated by Mr. Justice Field, speaking for the court in the case of *Noyes* v. *Mantle*, 127 U. S. 348, 353, are unanswerable, and forbid an adjudication that the term "known vein" is to be taken as synonymous with "located vein," and compel a reiteration of the declaration heretofore made, that the term refers to a vein or lode whose existence is known, as contradistinguished from one which has been appropriated by location; and as to the other matter, that the title to portions of this horizontal vein or deposit, "blanket" vein as it is generally called, may be acquired under the sections concerning veins, lodes, etc. The fact that so many patents have been obtained under these sections, and that so many applications for patents are still pending, is a strong reason against a new and contrary ruling. That which has been accepted as law and acted upon by that mining community for such a length of time, should not be adjudged wholly a mistake and put entirely aside because of difficulties in the application of some minor provisions to the peculiarities of this vein or deposit. With this explanation of the reasons for the long delay in the decision of this case, we pass to the special matters in controversy.

The questions presented by the pleadings to be tried were, whether there was a vein or lode within the territorial boundaries of the placer; and if so, whether it was a known vein or lode within the meaning of section 2333. The plaintiff, to maintain its case, offered in evidence simply its patent and other matters of record, together with parol proof of bounda-

ries.    By this record evidence it appeared that the application
for the placer patent was made on the 13th of November,
1878; that entry and payment were on the 21st of February,
1879; and that the patent was issued on January 30, 1880.
The location certificate of the Goodell lode was dated March
10 and recorded March 11, 1879, reciting a location on Febru-
ary 1, 1879.    After the introduction of this testimony the
plaintiff rested, and by it a *prima facie* title to the whole
placer claim was established.    The location of the Goodell
lode was some months after the application for the placer
patent.    The defendant, to maintain its claim, offered the tes-
timony of several witnesses, testimony which established be-
yond any doubt that in 1877, and more than a year before
any proceedings were initiated with reference to the placer
patent, the grantors of defendant entered upon and ran a
tunnel some 400 feet in length into and through that ground
which afterwards was patented as the placer tract; and that
in running such tunnel they intersected and crossed three
veins, one of which was thereafter, and in 1879, located as the
Goodell vein or lode.    The vein thus crossed and disclosed by
the tunnel was from seventy-five to seventy-eight feet from
its mouth, of about fifteen inches in width, with distinct walls
of porphyry on either side, a vein whose existence was obvious
to even a casual inspection by any one passing through the
tunnel.

With this general statement, we notice the two or three
matters which are the special objects of contention; and, first,
it is said that the court erred in giving this instruction :

"If there was a lode in that Territory, and it was known to
Moyer as an existing lode at this time — and by this time I
mean the first of February, 1879, or at the time these loca-
tions were said to have been made — and the lode had been
previously discovered by the locators of these claims, then
the placer patent is not sufficient to convey them.    In other
words, they are excepted by the terms of this statute from
the provisions of the patent, and the owners of that title now
have no right to them."

In other words, the court ruled that if the vein was

known to the placer patentee at or before entry and payment, although not known at the time of the application for patent, it was excepted from the property conveyed by the patent. Into this ruling the court was doubtless led by the language of the patent, which in terms exempts all veins or lodes known to exist at the date thereof; that is, the date of the issue of the patent. In this respect there was error. The time at which the vein or lode within the placer must be known in order to be excepted from the grant of the patent is, by section 2333, the time at which the application is made. Its language is: " An application for a patent for such placer claim, which does not include an application for the vein or lode claim, shall be construed as a conclusive declaration that the claimant of the placer claim has no right of possession of the vein or lode claim." *Iron Silver Mining Co.* v. *Reynolds,* 124 U. S. 374; *United States* v. *Iron Silver Mining Co.,* 128 U. S. 673, 680. There was therefore a technical error in this instruction of the court; but one which obviously wrought no injury to the substantial rights of the plaintiff, because there is not a scintilla of testimony, a suggestion even, that between the year 1877 and the time of entry and payment there was any work done or discovery made on the placer ground in respect to the Goodell lode or in the tunnel. Everything that was done had been done in 1877; everything that was known at the time of the patent was known in 1877; so that the error of date in the charge was one not affecting the substantial rights of the plaintiff. If at the time of the entry there was a known vein, there was the same vein and the same knowledge in 1877, and before the application.

The second matter is this: Was there a known vein at the time of the application for a patent, within the meaning of section 2333? It was not then a located vein or lode, and the case was evidently tried by the plaintiff upon the theory that unless it was a located vein it was not a known vein, but that, as we have seen, is not a correct interpretation of the statute. It is enough that it be known, and in this respect, to come within the intent of the statute, it must either have been known to the applicant for the placer patent or known to the

community generally, or else disclosed by workings and obvious to any one making a reasonable and fair inspection of the premises for the purpose of obtaining title from the government. The proof abundantly establishes that within the last description the vein was a known vein. The placer tract was a small one of fifty-six acres. The tunnel ran 400 feet underneath its surface. At its mouth there was a large dump of earth taken from it. No one had a right to enter that ground as placer mining ground, unless he had made such an inspection as to enable him to make affidavit that it was adapted to such mining. No examination could have been made without disclosing the existence of this tunnel. That was a fact upon the surface, obvious to the most casual inspection. No one could be heard to say that he had examined that ground in order to ascertain that it was suitable for placer mining, and in such examination had not discovered the existence of this tunnel. It was not a little excavation, with a few shovelfuls of dirt at its entrance. The pile of dirt was evidence which no one could ignore, that it was a long tunnel, running far into the earth. It was in mining ground, as all this territory was believed to be, and, therefore, an excavation likely to disclose veins. As an applicant for a placer patent was chargeable with notice of the existence of the tunnel, so, also, was he chargeable with notice of whatever a casual inspection of that tunnel would disclose. He would not be heard to say, I did not enter and examine this tunnel, and, therefore, know nothing of the veins apparent in it. - The government does not permit a person to thus shut his eyes and buy. If there be a vein or lode within the ground, it is entitled to double price per acre for it and the adjacent fifty feet, and, with such interest in the price to be paid, it rightfully holds any applicant for a placer patent chargeable with all that would be disclosed by a casual inspection of the surface of the ground or of such a tunnel. The applicant must be adjudged to have known that which others knew, and which he would have ascertained if he had discharged fairly his duty to the government. Surely under the testimony the jury was warranted in finding that this was a known vein.

Another question is, whether this was such a vein bearing gold, silver, cinnabar, lead or other valuable deposit as that a discoverer could obtain title thereto under sections 2320 and 2325. It is undoubtedly true, that not every crevice in the rocks, nor every outcropping on the surface, which suggests the possibility of mineral, or which may, on subsequent exploration, be found to develop ore of great value, can be adjudged a known vein or lode within the meaning of the statute. As said by this court in the case of *United States* v. *Iron Silver Mining Co.,* 128 U. S. 673, 683: "It is not enough that there may have been some indications by outcroppings on the surface, of the existence of lodes or veins of rock in place bearing gold or silver or other metal, to justify their designation as 'known' veins or lodes. To meet that designation the lodes or veins must be clearly ascertained, and be of such extent as to render the land more valuable on that account, and justify their exploitation." And, yet, in the case of *Iron Silver Mining Co.* v. *Cheesman,* 116 U. S. 529, 536, this court sustained an instruction as to what constitutes a lode or vein, given in these words: "To determine whether a lode or vein exists, it is necessary to define those terms; and, as to that, it is enough to say that a lode or vein is a body of mineral, or mineral-bearing rock, within defined boundaries in the general mass of the mountain. In this definition the elements are the body of mineral or mineral-bearing rock and the boundaries; with either of these things well established, very slight evidence may be accepted as to the existence of the other. A body of mineral or mineral-bearing rock in the general mass of the mountain, so far as it may continue unbroken and without interruption, may be regarded as a lode, whatever the boundaries may be. In the existence of such body, and to the extent of it, boundaries are implied. On the other hand, with well-defined boundaries, very slight evidence of ore within such boundaries will prove the existence of a lode. Such boundaries constitute a fissure, and if in such fissure ore is found, although at considerable intervals and in small quantities, it is called a lode or vein."

. It is, after all, a question of fact for a jury. It cannot be

said, as a matter of law in advance, how much of gold or silver must be found in a vein before it will justify exploitation and be properly called a "known" vein.    In this case the only testimony offered upon this question was that by the defendant.    John Hayes, one of the parties who dug this tunnel, testified that his brother was the territorial assayer of Colorado at the time; and that he assayed the ore from this vein several times, and got from a .trace to three-quarters of an ounce of gold.    Three-quarters of an ounce would be fifteen dollars a ton.    That of itself may not be decisive as to whether the vein justified exploitation.    And yet the proofs filed in the Land Department, under which the patent to this entire placer claim was obtained, show no such amount of mineral.    What is sufficient to obtain title from the government is certainly sufficient to demand consideration by a jury.    We are told by counsel for defendant that the Father de Smet mine at Deadwood produces ore that runs less than five dollars to the ton, yet is of immense value and constantly worked, because of the large quantity of this low-grade ore.    So, here, the amount of the ore, the facility for reaching and working it, as well as the product per ton, are all to be considered in determining whether the vein is one which justified exploitation and working.    Beyond this the defendant produced Fred. G. Bulkley, a civil and mining engineer, who testified to an examination of the tunnel describing the various fissures and veins, and produced before the jury some of the ore taken from this vein.    The jury, therefore, had before them samples of the ore from the vein, they were advised as to its dimensions, as to its general course and direction, and as to the actual results of several assays, and upon this testimony they found that it was a known vein.

If it be said that the conduct of the parties who ran the tunnel makes against the present contention, in that when they reached this vein they did not stop and develop it, but on the contrary proceeded with the tunnel, and even after they had finished their work therein did not immediately commence to develop it; a satisfactory answer is found in the testimony. It appears that there was a prevalent belief that a rich blanket

vein was underlying the entire country, and this was the object of pursuit by all. The placer claim of the plaintiff was evidently not taken for placer mining, but because outside, and at a short distance therefrom, it had workings on this blanket vein; and believing that such vein at a slight dip extended under the placer ground, title was sought to the latter in order to prevent intr\`sion upon the former. In like manner they who ran the tunnel, having a claim on adjacent ground, were seeking the same blanket vein, which, wherever reached, had been found of great thickness and richness. All minor matters and less promising veins were subordinated to the search for this one rich vein. The conduct of the grantors of both of the parties was determined by a belief in the existence of this underlying vein; but whether their belief in its existence was well founded or not, whether their conduct in view of such belief was wise or not, are matters which do not detract from the credibility to be given to the testimony as to the width and character of this vein. We are of opinion, therefore, that the finding of the jury that this was a "known" vein within the scope of section 2333 was based upon sufficient testimony, and cannot be disturbed.

It is urged that there was error in admitting testimony as to this belief in an underlying vein, because the jury may have found against the plaintiff on the ground of the supposed existence of such a vein. It may have been competent as explanatory of the conduct of the parties, as indicated above; but whether this be so or not, the attention of the jury was directed by the court to the vein disclosed by the tunnel as the known vein upon which the rights of defendant rested. It made no reference to this supposed underlying vein, but did say :

"The evidence tends to prove that the discovery of mineral in these claims was made in a tunnel some time in 1877, I believe. The locations were not made on the surface of the ground until 1879, about the first of February. That was after the application for patent and before the entry, which was about the 21st of February, 1879, and, of course, before the patent was issued.

"If there was a lode in that Territory, and it was known to

Moyer as an existing lode at this time — and by this time I mean the first of February, 1879, or at the time these locations were said to have been made — and the lode had been previously discovered by the locators of these claims, then the placer patent is not sufficient to convey them."

And then, in closing the charge, it added:

" I think that is all, gentlemen, that there is in the case. I do not know that it is necessary to repeat it again — that the plaintiff's title must prevail unless it appears to you from the evidence that there was a lode existing in the ground, and that Moyer knew it at the time of making his entry and obtaining his patent, and that a location had been made upon it in a general way; that there was a certificate made; that there was a discovery of mineral within the claims; and that the lode was staked upon the surface and the like."

As there was no pretence of any discovery of this supposed underlying vein, obviously the attention of the jury was directed solely to the vein disclosed in the tunnel.

These are all the questions we deem important, and in the record there appears no substantial error. The judgment will therefore be

*Affirmed.*

Mr. Justice Field, with whom concurred Mr. Justice Harlan, and Mr. Justice Brown, dissenting.

I am unable to agree with my associates in the disposal of this case. The decision, and the opinion upon which it is founded, will do much, in my judgment, to weaken the security of patents of the United States for mineral lands, and leave them open to attack and overthrow upon mere surmises, notions, and loose gossip of the neighborhood which ought not to interfere with any rights of property resting upon the solemn record of the government.

The Iron Silver Mining Company, the plaintiff below and the plaintiff in error here, is a corporation created under the laws of New York, and the defendant, the Mike and Starr Gold and Silver Mining Company, is a corporation also created

under the laws of that State. The present action is in form one to recover an alleged mining lode claim a little over ten acres in extent, lying within the boundaries of a placer claim known as the William Moyer placer claim, of which the plaintiff is the owner; but it is in fact an action to determine the right of the defendant to a patent of the United States for that lode under proceedings taken in assumed conformity with section 2326 of the Revised Statutes. It was commenced in a District Court of Colorado, and on application of the plaintiff was removed to the Circuit Court of the United States.

The placer claim embraces fifty-six acres and a fraction of an acre, a full description of which, by metes and bounds, is given in the complaint. It is designated and known in the public surveys of mineral land as lot No. 300. A patent of the United States for it was issued to William Moyer on the 30th of January, 1880. The application for the patent was filed in the local land office on the 13th of November, 1878, and the claim was entered for patent and paid for on the 1st day of February, 1879.

The patent contains several express reservations or conditions, among them these two: — we quote their language from the instrument:

"First. That the grant hereby made is restricted in its exterior limits to the boundaries of the said lot No. 300, as hereinbefore described, and to any veins or lodes of quartz or other rock in place bearing gold, silver, cinnabar, lead, tin, copper or other valuable deposits which may hereafter be discovered within said limits, and which are not claimed or known to exist at the date hereof.

"Second. That should any vein or lode of quartz or other rock in place bearing gold, silver, cinnabar, lead, tin, copper or other valuable deposits, be claimed or known to exist within the above-described premises at the date hereof, the same is expressly excepted and excluded from these presents."

The patentee, Moyer, on the 24th of February, 1880, executed a quit claim deed of the premises to William H. Stevens and Levi Z. Leiter.; and on the 6th of March following these

parties conveyed the same to the plaintiff, and by its direction and at its cost, large and expensive works were subsequently erected on the premises for the development of the mine and the extraction of the precious metals.

The defendant in answer to the action, besides denying the right of the plaintiff to the possession of the premises, relies upon two defences — the acquisition of a lode claim known as the Goodell lode from the original locators, and the acquisition of a lode claim known as the Thomas Starr lode. In stating the first defence it recites the exceptions stated to the patent, and sets up "that at the time of the location of said placer claim, and the survey thereof, and at the time of the application for patent, and at the time of the entry of said land thereunder, and at the date of the issuance and granting of said patent, a lode, vein, and deposit of mineral, of quartz and other rock in place, carrying carbonates of lead and silver, was known to exist and was claimed within the boundaries of said William Moyer placer claim, survey No. 300, and that the fact that said vein was claimed and did exist within said premises was known to the said William Moyer, the patentee of said claim, at all the times hereinbefore mentioned; " that said vein was known and claimed as the Goodell lode; and that on the first day of February, A.D. 1879, Maurice Hayes, John Hayes, George C. Gardner, and R. E. Goodell, then citizens of the United States, went upon the premises and sunk a shaft and run a tunnel therein, which uncovered and exposed said vein, lode, and deposit; that they thereupon proceeded to locate the same as a lode claim, by putting up a notice containing the name of the lode, the date of the location, and their own names as locators, and marked the surface boundaries by posts and afterwards caused a location certificate to be filed in the office of the clerk and recorder of the county, containing the name of the location, the names of the locators, the date of location, and the number of feet claimed in length on each side of the centre of the discovery shaft; whereby the said locators became the owners of and entitled to the possession of said lode, the title to which afterwards by several mesne conveyances became vested in the defendant.

In stating the second defence the defendant sets up that the claim upon which it is now at work is a well defined vein of quartz bearing silver and other valuable metals and that the same was discovered by Maurice Hayes, John Hayes and Thomas Starr, on the 9th of November, 1877, and immediately afterwards, on the discovery of the lode, the locators caused a shaft to be sunk to the depth of more than ten feet below the surface, and within three months thereafter located the same by marking the boundaries with substantial stakes, and by filing in the office of the clerk and recorder of the county, in which the claim is situated, a certificate of its location, containing the name of the lode, the names of the locators, the date of location, the number of feet in length claimed on each side of the centre of the discovery shaft, and the general course and direction of the claim, and that in said location certificate and upon the location stake the same was called the Thomas Starr lode, and that afterwards by various mesne conveyances the property became vested in the defendant. No evidence was offered on the trial with reference to this Thomas Starr lode set up in the second defence, and no certificate of its location was produced; it may, therefore, be considered as out of the case. The controversy relates only to the Goodell lode claim set up in the first defence. The location certificate of this lode claim bears date on the 10th day of March, 1870, and recites that the claim was located on the 1st of February, 1879. The averment that its original locators, on the 1st of February, 1879, went upon the premises and sunk a shaft and ran a tunnel thereon, which uncovered and exposed the vein, lode and deposit, and that they thereupon proceeded to locate the same, was not supported by the evidence produced. The location of the claim was not preceded by the discovery of the existence of the precious metals within it. The statute of the United States, respecting mining claims upon veins or lodes of quartz or other rock in place, bearing gold and silver, declares that "no location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located." Rev. Stat. sec. 2320. One of the locators, John Hayes, was examined as a witness, and testified that he helped the

surveyor to survey the lode claims — the Goodell and Gardner claims — and drive down the stakes; that afterwards he filed the certificate of location; that he knew the discovery shafts of the claims, and had been in them; that there was no discovery of any vein or lode of valuable mineral deposits within them; and that those shafts were sunk in 1879. And the tunnel alleged to have been then run was commenced and completed years before.

On the 11th of March, 1879, the locators filed with the county clerk and recorder of Lake County — the county within which the alleged lode lies — a location certificate of the lode claim, and on the 13th of April, 1881, the defendant, which had succeeded to their interest, made application for a patent for the same. The plaintiff below and in this court, the Iron Silver Mining Company, filed in the land office its adverse claim to the application for a patent under assumed conformity with the provisions of section 2325 of the Revised Statutes, and this action is brought by that company to determine, as between the parties, the right to the possession of the land embracing this alleged lode in pursuance of section 2326. The case was tried before a jury, and the only direct evidence offered to show the existence of a known vein or lode bearing gold or silver within the placer claim was contained in the testimony as to the tunnel run, called the Mike tunnel, and discoveries made in it. It was shown that the tunnel was commenced in January, 1877, and completed on the 24th of April following. It extended 400 feet, but it disclosed within it only veins of decomposed porphyry and manganese iron. The statement that it intersected and crossed three veins is only correct in that they were veins of that character. There was no vein or lode of gold or silver bearing rock found in the tunnel, and there is an erroneous impression conveyed by the opinion of the court in that respect. The material evidence in the record as to what was found in the tunnel is given in the note below from which it will appear, as stated above, that only veins of decomposed porphyry and manganese iron were found there. No gold or silver was discovered in it, except in one instance, and then merely a

trace of gold at about seventy-five feet from the mouth of the tunnel, from which only three-quarters of an ounce was obtained. This discovery did not establish the existence "of a lode, vein or deposit of mineral in quartz or other rock in place carrying carbonates of lead and silver," as averred in the answer of the defendant. It did not of itself constitute a vein or lode in gold or silver bearing rock; it was loose gold and was not sufficient, of itself, to induce further work upon the tunnel, or even to lead to a location of a mining claim in it. From the completion of the tunnel up to the time when this case was on trial, extending over eight years and a half, no work was done upon the tunnel, nor was any attempt made to use it, or to develop any pretended mine in it. By the law there must have been a location upon the vein in it, if there was one, before any right to such vein could be initiated; and had such location been made, the right thus acquired was lost and forfeited by abandonment years before this action was commenced. But as I shall show hereafter, the mere indication or presence of gold or silver is not sufficient to establish the existence of a lode. The mineral must exist in such quantities as to justify expenditure of money for the development of the mine and the extraction of the mineral. It would create surprise among miners to be told that if a trace of loose gold, such as is shown here, was found at any one spot in a tunnel leading to a placer claim, it would establish the existence of a vein or lode in the placer claim, and form the basis of a proceeding to despoil a purchaser from the patentee, years after the purchase, of a large portion of its mining property.

Evidence was also offered against the objection of the plaintiff to show that there were other lodes in the vicinity of the placer claim of the plaintiff and also of the placer claim of Wells and Moyer; and also that parties in the neighborhood *believed* — not that they knew — that there was a vein or lode lying under those placer claims, and also of conversations in 1877 with one Stevens, who acquired his interest by purchase with one Leiter from the patentee more than a year after the patent was issued, as to his opinion of the existence of mineral

at a place where he had at the time men at work, and "*under-lying all the ground there;*" but it was not shown that the place thus loosely designated embraced the premises in controversy.[1]

---

[1] NOTE. — There were four witnesses examined as to what was found in the Mike tunnel. All that is important in their testimony bearing upon that point is here given.

### 1. *Baldwin.*

Mr. Baldwin examined the Mike tunnel with reference to whether there was a vein disclosed in it, and testified that there were several veins exposed in the course of the tunnel; that at a point about seventy-five feet in from the mouth, was disclosed a lode with porphyry walls, or, at least, a porphyry wall on the west side, dipping to the east, and a vein showing decomposed porphyry with some pieces of iron at different points in the lode, and that there were other lodes found further in the tunnel, but that he never was in the tunnel until about a month before giving his testimony.

### 2. *Morris.*

Mr. Morris knew the Mike tunnel, and that there were discoveries of lodes in that tunnel, three, he guessed, and testified as to the character of the filling of the largest vein, that it was decomposed porphyry, and manganese iron, and did not know whether it ever carried any mineral or not, of his own knowledge; that the second vein was about seventy or eighty feet from the first one; and being asked what was found in the vein that indicated that it was a vein — what kind of mineral — answered decomposed porphyry and soft material — some iron.

### 3. *Hayes.*

Mr. Hayes testified that he discovered in the Mike tunnel a vein; that he struck the pick into it himself, about the 15th or 16th of February, 1877, about seventy-five feet from its mouth; that it was about eighteen inches wide, and was decomposed quartz and a clay and vein matter; that he got several colors of gold in it, and his brother, who was the territorial assayer of Colorado at that time — but dead now — had it assayed several times, and he got from a trace to three-quarters of an ounce of gold in it. He also testified that four veins were discovered — the one nearest was about two hundred feet from the mouth of the tunnel — and, in answer to the question what kind of vein it was, said: It is similar to the first one. Well, the first one is more decomposed, the porphyry, the walls of it; this last one we have got here is what we call block porphyry — more solid porphyry.

On cross-examination he said it was a vein existing in the porphyry — decomposed matter between porphyry, decomposed quartz and shale.

At the close of the testimony in the case the plaintiff moved the court to instruct the jury to find a verdict in its favor, on the grounds, among others, that the Goodell claim of the defendant was not located or recorded until after the application was made for the patent of the William Moyer placer claim, and that there had not been a discovery in the shafts of the defendant of any vein or lode of quartz or other rock in place bearing any valuable deposits. But the court denied this motion, and to its denial exception was taken.

Among the instructions to the jury the plaintiff then requested the court to give the following:

---

#### 4. *Fred G. Bulkley.*

Mr. Bulkley testified as to an examination of the Mike tunnel. He said: " The first material which the tunnel encounters as it passes into the hill is a loose wash and gravel, that extends for a distance of about twenty-five feet to thirty feet, and the next material encountered is white rock, or rather rock the surface of which has about the same slope as the surface of the hill. The rock that is first encountered is porphyry, and it is rather shattered and somewhat soft, and as depth is gained it gains a hardness until — at the depth of 78 feet it is found to be hard and in place, or, in fact, before reaching that point, but unquestionably so at the point 78 feet from the mouth of the tunnel. . . . Lying upon the foot-wall there is a streak of clay which is perfectly continuous, so far as the developments show. That clay is from an inch to six inches thick; it is hard, leathery clay, and one can catch hold of a projecting portion and pull it down as one would the bark from a tree. It is hard and tough. Next to that there is a mixed mass of iron-stained porphyry and clay, the iron having a thickness of from eight to twelve or fourteen inches. Next to that, as shown by the red mark in the sketch of which I am speaking, is a band of iron at a thickness of from two to six or eight inches."

#### *Cross-Examination.*

Q. Mr. Bulkley, what kind of a vein is that that you have described in the tunnel? — A. I haven't described it as a vein. In speaking of it I used the term vein inadvertently once, because, while it possesses such characteristics of a vein as will be determined upon inspection, other characteristics, I think, would have to be determined by analysis. For instance, it has the general indication of lateral extent and extent in depth — that is, it has a very considerable lateral extent in the direction of the strike and dip. The material which is enclosed in it — I have brought a piece with me — it looks very much as though it would carry silver, and possibly some gold, but to speak positively upon that point is more than I can do. I venture to say it looks like it, and most any miner will agree with me.

1. That the terms "vein or lode" and "vein or lode claim," as used in section 2333 of the Revised Statutes of the United States, mean and refer to vein or lode mining claims which have been discovered, located and recorded within the boundaries of a placer claim before the time when the application is made for the placer patent. And unless the jury find from the evidence that the alleged Goodell lode claim of defendant had been discovered, located, and recorded in accordance with the law governing the location and acquiring title to mining claims before the time when the application was made for the said placer patent, the said lode claim is not excepted or excluded from the grant of the said placer patent, and does not come within the reservation clause in said patent.

2. That a lode claim located or attempted to be located within the exterior boundaries of a placer claim at any time after the time of making the application for patent to the placer claim gives no right or title; any lode so located is not reserved from the grant of the placer patent. This rule applies to all lode claims located between the time of the application for the placer patent and the making of the entry and the issuing of the patent.

3. That to constitute a valid title to a lode mining claim the locators of such claim are required to make a discovery of a vein, lode or ledge carrying valuable deposits, within the boundaries of such lode claim, before the same is located and recorded, and if such discovery is not made the location is void and creates no title or right of possession in the attempted locators; and if the said defendants made no such discovery of a vein, or lode, or valuable deposit within the boundaries of the said Goodell lode claim, then they acquired no title or right to possession whatever by virtue of their pretended location.

But the court refused to give either of these instructions, and to its refusal to each one an exception was taken at the time.

The jury found for the defendant. To reverse the judgment entered upon its verdict the case was brought to this court on writ of error.

The contention between the parties to this action is as to which of them is entitled to the possession of the land embracing the alleged lode claimed by the defendant., In the case of the same plaintiff against Campbell and others, recently decided, (135 U. S. 286,) it was held that to an application for a patent for a lode claim within the boundaries of a patented placer claim, the holder of the patent was not bound under the statute to interpose any objections he might have; that such objections were required only from parties seeking a right to a patent as against the lode claimant, and not from one who already had a patent. But before that decision was made the plaintiff here had interposed objections to the application of the lode claimant, setting up his adverse claim to the premises under the placer patent; and the present action has followed that proceeding, the plaintiff supposing that it was bound, in order to protect its rights, to interpose and set up its adverse claim.

Assuming that the plaintiff is thereby estopped from denying its obligation to contest the right of the lode claimant in this way — which may well be doubted — I proceed to consider the questions presented for a reversal of the judgment obtained.

The presumption in favor of its validity attends the placer patent, as it does all patents of the government of any interest in the public lands, which they purport to convey. So potential and efficacious is such presumption that it has been frequently held by this court, that if under any circumstances in the case the patent might have been rightfully issued, it will be presumed as against any collateral attack, that such circumstances existed. *Smelting Mining Co.* v. *Kemp*, 104 U. S. 636, 646. As was said by the Circuit Court in the *Eureka Case*, a patent for a mining claim is iron-clad in its potency against all mere speculative inferences. 4 Sawyer, 302. The burden of proof therefore rested upon the defendant to show affirmatively that it was entitled, as against that patent, to the possession of the lode claim, on the ground that the lode was excepted from the patent in express terms.

A lode claim of the same richness as a placer claim is of

much greater value than the difference in price per acre fixed by the government. By the depth to which such a lode usually extends a much larger quantity of mineral is obtained from it than from a placer claim covering the same extent of surface ground; it is, therefore, as a general rule, far more remunerative. As the lode claim of the defendants in this case embraces a little over ten acres, it is difficult to believe that the applicant for a placer claim embracing it, if it was known to exist at the time, would have neglected to apply for it, when it could have been obtained at the trifling expense of twenty-six dollars. The possibility of others invading the placer boundaries, if within them there was a known vein or lode, would naturally have been the occasion of much uneasiness to the owners of the placer claim, to avoid which we may well suppose they would readily have incurred expenses vastly above the government price of the lode claim. Clear and convincing proof would seem, therefore, to be necessary to overcome the presumption thus arising, that the applicant for the placer patent did not know at the time of the existence of any such lode. Especially would this seem to be required where, as in the present case, knowledge of such lode by the patentee is averred only after the mine patented has passed into other hands, and extensive explorations have been made and large expenditures incurred in developing it, in supposed possession of the title to the entire property.

The exceptions to the operation of the patent are founded upon section 2333 of the Revised Statutes, which is as follows:

"Where the same person, association or corporation is in possession of a placer claim, and also a vein or lode included within the boundaries thereof, application shall be made for a patent for the placer claim, with the statement that it includes such vein or lode, and in such case a patent shall issue for the placer claim, subject to the provisions of this chapter, including such vein or lode, upon the payment of five dollars per acre for such vein or lode claim, and twenty-five feet of surface on each side thereof. The remainder of the placer claim, or any placer claim not embracing any vein or lode claim, shall be

paid for at the rate of two dollars and fifty cents per acre, to-gether with all costs of proceedings; and where a vein or lode, such as is described in section twenty-three hundred and twenty, is known to exist within the boundaries of a placer claim, an application for a patent for such placer claim which does not include an application for the vein or lode claim shall be con-strued as a conclusive declaration that the claimant of the placer claim has no right of possession of the vein or lode claim; but where the existence of a vein or lode in a placer claim is not known, a patent for the placer claim shall convey all valuable mineral and other deposits within the boundaries thereof."

This section, as we have said on more than one occasion, makes provision for three distinct classes of cases:

1. Where one applies for a placer patent, who is at the time in the possession of a vein or lode included within its boundaries, he must state the fact, and then, on payment of the sum required for a vein or lode claim and twenty-five feet on each side of it at $5.00 per acre, and $2.50 an acre for the placer claim, a patent will issue to him covering both claim and vein or lode.

2. Where a vein or lode such as is described in a previous section of the Revised Statutes — that is, of quartz or other rock in place bearing gold, silver, cinnabar, lead, tin, copper or, other valuable deposits — is known to exist at the time within the boundaries of the placer claim, the application for a patent therefor, which does not also include an application for the vein or lode, will be construed as a conclusive declaration that the claimant of the placer claim has no right of possession to the vein or lode.

3. Where the existence of a vein or lode in a placer claim is not known at the time of the application for a patent, that instrument will convey all valuable mineral and other deposits within its boundaries. *Iron Silver Mining Co.* v. *Reynolds,* 124 U. S. 374, 382; also *Reynolds* v. *Iron Silver Mining Co.,* 116 U. S. 687, 696.

In *Iron Silver Mining Co.* v. *Reynolds,* 116 U. S. 687, 692, the court, after stating the substance of this section, added

that it was not easy to define the words "known to exist" in the act, stating that it was not necessary to inquire in that case whether this knowledge must be traced to the applicant for the patent or whether it was sufficient that the existence of the lode was generally known; and what kind of evidence was necessary to prove this knowledge, and observing that it was perhaps better that these questions should be decided as they arose.  They did not arise there because the court took the evidence from the jury on the ground that the defendants were trespassers.

When the same case was again before the court at October term 1887, it was expressly held that the statute did not except veins or lodes " *claimed* or known to exist " at the date of the patent, but only such as were "known to exist," and that it fixed the time at which such knowledge was to be had as that of the application for the patent. *Iron Silver Mining Co.* v. *Reynolds*, 124 U. S. 374, 382.  The same doctrine was declared in *United States* v. *Silver Mining Co.*, 128 U. S. 673, 680.

To bring, therefore, a vein or lode of quartz or other rock in place bearing precious metals within the exceptions of the statute, and of course within those of the patent to the extent to which they are operative, the vein or lode, according to the decisions referred to, must have been *known to exist at the time application was made for the patent.*  The applicant could not, of course, speak of discoveries not then made; necessarily, his knowledge must have been limited to the time of his application.  The court below, however, held that it was sufficient if the lode in controversy was known to exist at the date of the patent, and not at the date of the application for it.  It stated expressly that it would not enter into any consideration of the validity of the exceptions made in the patent, whether they conformed to the statute or not, but would follow the patent, and so ruled during the whole trial, both in the admission of testimony and in the instructions to the jury, giving them to understand in the most explicit terms that if a lode was discovered and a location made before the issue of the patent for a placer claim, that lode was excepted from

the patent, although such discovery and location were made subsequent to the application for the patent.

In thus holding there was a plain departure from the express and repeated decisions of this court, for which error alone the judgment ought to be reversed. The ruling could not have failed to mislead the jury, and to direct their attention to matters not properly open for their consideration. But independently of this error, there were material objections to evidence admitted on the trial to establish the existence of the supposed lode even upon the theory of the court below as to the time when such existence must have been known, and to its instructions upon portions of such evidence, and to its refusal to order a verdict for the plaintiff upon the grounds stated.

At the outset of this case it becomes important to determine what is meant by a "*known* lode" within the purview of the statute, which, if not applied for by the patentee, is excepted from the patent; and also when a right to such a lode is initiated by a claimant, and to that consideration I will now direct attention. And first, what is meant by a lode or vein of quartz or other rock in place bearing gold or silver? The first reported case in which a definition was attempted is the *Eureka Case*, 4 Sawyer, 302, 311. The court, after observing that the word was not always used in the same sense in scientific works on geology and mineralogy, and by those actually engaged in the working of mines, said: "It is difficult to give any definition of the term as understood and used in the acts of Congress which will not be subject to criticism. A fissure in the earth's crust, an opening in its rocks and strata made by some force of nature, in which the mineral is deposited, would seem to be essential to the definition of a lode in the judgment of geologists. But, to the practical miner, the fissure and its walls are only of importance as indicating the boundaries within which he may look for and reasonably expect to find the ore he seeks. A continuous body of mineralized rock, lying within any other well-defined boundaries on the earth's surface and under it, would equally constitute, in his eyes, a lode. We are of opinion, therefore,

that the term, as used in the acts of Congress, is applicable to any zone or belt of mineralized rock lying within boundaries clearly separating it from the neighboring rocks." And this court in *Iron Silver Mining Co.* v. *Cheesman,* 116 U. S. 529, 534, followed this citation by observing: "This definition has received repeated commendation in other cases, especially in *Stevens* v. *Williams,* 1 McCrary, 480, 488, where a shorter definition by Judge Hallett, of the Colorado Circuit Court, is also approved, to wit: 'In general it may be said that a lode or vein is a body of mineral, or mineral body of rock, within defined boundaries, in the general mass of the mountain.'" To constitute, therefore, a known lode, within the meaning of the statute, a belt or zone of mineralized rock lying within boundaries clearly separating it from the neighboring rock, must not only be ascertained, but must be so far developed or defined as to be capable of measurement. A right to a lode can only be initiated by location, and the statute declares that no location can be made until the discovery of a lode or vein bearing metal. And to embrace the lode within the patent of a placer claim the applicant must, if it be known, pay for it at the rate of five dollars per acre. But he cannot pay any sum, or offer to pay so as to be effectual, until he can ascertain the number of acres contained in the lode claim desired, that is, until the ground can be measured. Nor could the officers of the land department accept any sum from the applicant until such measurement, upon a mere speculative opinion as to the extent of the supposed lode. In *Sullivan* v. *Iron Silver Mining Co.,* 109 U. S. 550, this question was considered by the Circuit Court, but was not passed upon by this court, it not being deemed to necessarily arise on the pleadings. The plaintiff in that case had brought an action upon a patent for a placer claim. The defendant had located within it a lode claim after the patent was issued, and he set up in defence that the lode was known to the patentee at the time of the application for the patent, and not having been embraced in it was by the statute excluded from the patent. The plaintiff demurred to this answer, and the court held it was insufficient in not averring that the lode had been dis-

covered and located or recorded at the time of the application.
But this court, without passing upon the necessity of such
location or record, held that as a matter of pleading it was
sufficient to aver that the lode was known to exist by the
patentee at the time of his application for a patent, and was
not included in his application, observing that, by the ele-
mentary rules of pleading, facts may be pleaded according to
their legal effect, without setting forth the particulars that
lead to it.    The question as to what constitutes a known lode
remained, therefore, unaffected by that decision.

For the reasons stated above it would seem that not merely
must a discovery of mineral be made to constitute a known
lode within the meaning of the statute, but that such develop-
ment of its extent must be made as to enable the applicant
to comply with the law in tendering the requisite price.    The
Circuit Judge, Mr. McCrary, who rendered the judgment of
the Circuit Court, thus reversed on a point of pleading, felt
that the construction placed by him upon the statute was the
only one which made it consistent with itself or practicable in
application.

"The first thing," he observes, "that strikes us as impor-
tant in the construction of this language [of section 2323] is
that we are referred back to section 2320 for a description of
the vein or lode which is referred to, and which is not to pass
to the patentee, unless he has complied with this provision of
the statute: 'Where a vein or lode, such as is described in
section 2320.'    What sort of vein or lode is described in
section 2320 ?

"By reference to that section, we see that it relates entirely
to vein or lode claims, and the description which it contains is
a description of the metes and bounds of a vein or load claim,
. . . not the lode simply, but a lode claim; one that has
been located, which has boundaries, which has been devel-
oped; it gives us its dimensions; it declares it shall have been
located; it says it shall be a claim in which there has been a
discovery of mineral, etc.

"I am of the opinion that a vein or lode that has never
been claimed, that has not been located, that has not been

marked out by metes and bounds, and in which there has been no actual development, or, to use the language of the statute, 'discovery of a vein or lode within the limits of the claim located,' is not a vein or lode such as is described in section 2320. The description must refer to these things; the section describes nothing else, and to its description we are plainly referred. It follows that the language . . . must refer to a vein or lode which has been located, which has boundaries, which has a locality, which has had some sort of development, or else it cannot be such a vein or lode as is described in section 2320." 5 McCrary, 274, 277, 278.

The case of *Noyes* v. *Mantle*, 127 U. S. 348, does not, when properly understood, militate, as supposed, against this view. The court in its language there used had reference to the rights of parties other than the applicant for the placer patent, when it said that the statute did not apply to lodes or veins within the boundaries of a placer claim which had been previously located under the laws of the United States, and were in the possession of the locators, and could apply only to lodes or veins not taken up and located so as to become the property of others. The statute has reference to cases where the same person, association or corporation is in possession both of the placer claim and of the vein or lode within its boundaries. In such cases, if the lode claim is known to the applicant to exist, he must designate it in his application; but it cannot, of course, be known to him to exist, whatever his conjectures may be, until the lode is discovered and located so as to enable him to state its existence and extent in his application for a patent of the placer claim, and to tender the price per acre required:

If there be any variance between these views and those expressed in *Iron Silver Mining Co.* v. *Reynolds*, 124 U. S. 374, 384, as to the manner in which knowledge of the existence of a lode within the boundaries of a placer claim may be obtained, it is because of a more careful consideration of the subject in later years than formerly, and of larger experience in mining cases.

As stated above, there can be no location of a lode or vein

until the discovery of precious metals in it has been had. And then it is not every vein or lode which may show traces of gold or silver that is exempted from sale or patent of the ground embracing it, but those only which possess these metals in such quantity as to enhance the value of the land and invite the expenditure of time and money for their development. No purpose or policy would be subserved by excepting from sale and patent veins and lodes yielding no remunerative return for labor expended upon them. Such exceptions would only be productive of embarrassment to the patentee, without any benefit to others. In a suit brought by the United States to cancel certain placer claims against the plaintiff in this case, alleging, among other things, that the patents were obtained by false and fraudulent representations, that the land contained no known veins or lodes of quartz or other rock in place bearing gold or silver or other metals, the court, speaking of the evidence in the case as insufficient to sustain the allegation, said : " It is not enough that there may have been some indications, by outcroppings on the surface, of the existence of lodes or veins of rock in place bearing gold or silver or other metal to justify their designation as 'known' veins or lodes. To meet that designation the lodes or veins must be clearly ascertained and be of such extent as to render the land more valuable on that account, and justify their exploitation." *United States* v. *Iron Silver Mining Co.*, 128 U. S. 673, 683. See to the same purport *Deffeback* v. *Hawke*, 115 U. S. 392, 404, and *Colorado Coal Co.* v. *United States*, 123 U. S. 307, 328.

In the case at bar, as stated above, the alleged location of the lode of the defendant was not preceded by the discovery of any precious metals within it. There was, therefore, in fact no lode to locate, and of course no location initiated or measurement possible. (Rev. Stat. 2320.) No weight ought to be given to a defence resting upon such a basis. The court below should have insisted upon proof of the discovery of mineral in the alleged lode claim of the defendant, or have directed a verdict as moved in favor of the plaintiff. And when the motion was refused, if the views I have expressed of

what constitutes a known lode within the meaning of the statute, and as to the knowledge of such lode at the time of the application for the patent, be correct, the instructions as refused should have been given, and their refusal was error for which the judgment should be reversed.

Much of the evidence received at the trial was also subject to serious objections. To show that the alleged lode of the defendant was known to exist before the patent was issued, the court below allowed evidence, against the objection of the plaintiff, to be introduced, that there were other lodes in the vicinity of the placer claim of the plaintiff and also of the placer claim of Wells and Moyer; and also evidence that parties in the neighborhood believed that there was a vein or lode lying under those placer claims, and also evidence of conversations in 1877 with one Stevens, who only acquired his interest, by purchase with one Leiter, from the patentee more than a year after the patent was issued, as to his opinion of the existence of mineral *underlying all the ground* where he had men at work, although the ground thus loosely designated was not shown to have covered the premises in controversy.

1. At the outset of the trial the deposition of one Leonhardy was introduced in which he was allowed to testify in regard to lode claims located in the vicinity of the placer claim of the plaintiff and the placer claim of Wells and Moyer, against the objection of the plaintiff that the testimony was not competent or relevant. He stated that he knew of a "great many holes having been sunk there" between 1860 and 1880. And he referred to the claim of the Oro La Plata and to the Pennsylvania claim, and was allowed to give testimony as to the character of the dump of the former, and also of the underground workings of the latter, and of the kind of vein that it disclosed. He was also permitted to speak of adjoining mines, called the Rock and Dome mines, and how long he had known them, and of his examination of their workings. Testimony of the same general character, though less full in detail, in reference to the same and other claims in the vicinity of the placer claim, was given by other witnesses.

It would seem that the court below, in admitting evidence

respecting other lodes in the vicinity of the placer claims, went upon the idea that it would support the theory on which it was supposed the contention of the defendant would be made, that there was only one lode running through all the ground in the neighborhood of the placer claims, although no such theory was advanced in fact. The error of this course of procedure and its tendency to mislead the jury are manifest. The existence of a lode covering everything or running through the whole country was not a matter to be assumed or to be shown by evidence of the existence of different lodes in the vicinity of the placer claim. If such an extended lode existed, its existence was to be established as any other matter of fact in the case, by competent proof. There is no necessary connection between the existence of lodes outside of a placer claim and one in it. It is true there may be instances, or at least they may be supposed, where the general condition and developments of a mining lode adjoining a placer claim may establish the fact that a lode enters within such claim, as for example, where the working of the lode is up to the line of the placer claim, and the lode continues to the point of contact. One then can satisfy himself, by examination, of the penetration of the lode to some extent within the claim. But no such knowledge can come from the workings of lodes at a distance from a placer claim as in this case. It is a matter well known to persons at all familiar with mining for the precious metals that veins rich in gold and silver are generally found with barren rock within a few feet on each side of them, and that such veins more frequently than otherwise come abruptly to an end. No one thus familiar would feel justified in concluding from the mere distance or vicinity of other mines that they had any necessary connection with each other. In accordance with this doctrine, this court held, in *Dahl* v. *Raunheim*, 132 U. S. 260, 269, that the discovery by the defendant in that case of a lode two or three hundred feet outside of the boundaries of the placer claim in suit did not "create any presumption of the possession of a vein or lode within those boundaries, nor, we may add, that a vein or lode existed within them." The admission of the evidence in ques-

tion was well calculated to confuse the jury and mislead their judgment.

2. The witness Leonhardy was also allowed, against the objection of the plaintiff, to state that there was knowledge *among the people* in the vicinity of the placer claim of the plaintiff, at the times he visited the country, as to the existence of a vein or deposit of mineral underneath the claims. He testified that there was such knowledge at those times; that wherever they, the people, sunk, there they found mineral, without stating what or where people sunk or the character of their developments, the knowledge being evidently no more than an opinion or belief which parties in the vicinity had formed on the subject. The witness Reed was allowed to state that there was a general understanding that there was a vein under the placer claim. Of the inadmissibility of this kind of evidence to establish the existence of a valuable vein or lode of mineral and knowledge of it by the patentee on his application for the patent, it would seem there could be no question. The opinions and belief of the neighborhood do not show knowledge of the existence of a lode or vein of valuable mineral. On this point we have an express adjudication in the case of *Iron Silver Mining Co.* v. *Reynolds,* when it was here at October term, 1887, 124 U. S. 374, 384. It was there held that mere belief as to the existence of a valuable lode, founded even upon investigation as to the character of the ground, did not amount to knowledge under the statute. "The statute speaks," said the court, "of acquiring a patent with a knowledge of the existence of a vein or lode within the boundaries of the claim for which a patent is sought, not the effect of the intent of the party to acquire a lode which may or may not exist, of which he has no knowledge. Nor does it render belief, after examination, in the existence of a lode, knowledge of the fact. There may be difficulty in determining whether such knowledge in a given case was had, but between mere belief and knowledge there is a wide difference. The court could not make them synonymous by its charge and thus in effect incorporate new terms into the statute." Purchasers from a patentee holding the instrument of the

general government conveying to him fifty-six acres and a fraction of an acre of valuable mineral ground are not to be deprived years subsequent to their purchase of nearly one-fifth of it, or, indeed, any portion of it, because his neighbors at the time or subsequently residing near the premises believed that there was a vein or lode under the surface of his claim which he ought not to have. To sustain the admission of such beliefs or opinions in evidence against the patent would be to take from that instrument of the government all the peace and security which it is supposed to give to its possessor in the enjoyment of the property it transfers to him. An unlocated lode claim, existing only in the impressions and beliefs of neighbors or others, and not in knowledge founded upon discovery and exploration, does not seem to me to have any element of property or validity as a basis of a defence to proceedings to obtain a patent from the government.

3. The testimony received of conversations of the same witness with Stevens, as to the latter's opinion in 1887 of the existence of a large body of metal "underlying all the ground there," referring to ground where he had employed men to work, would seem to be subject to still greater objection, for it was not shown that the ground referred to embraced the premises in controversy. Leonhardy testified that in the spring of 1877 Stevens came to his house and told him that the country, referring to the ground upon which his men were at work, was good, the best mineral country he ever saw, but that if he told the men he had employed so, they would leave him as soon as they got there and go on their own hook; and again, that he had found an immense body of mineral underlying all that ground there, that he had shipped many tons which had paid him a handsome profit, and that he was going to secure the ground and begin very heavy operations. It does not appear, however, what operations he did commence, if any, or what interest he then had in the "ground there" beyond that of a prospector and explorer, or that he ever made any mining location himself, or acquired any title to any mines except by the purchase mentioned from the patentee. Nor does it appear that he possessed any special knowledge of the

character of the mines. He had only an impression and theory that the land was rich in mineral. Without making the many possible allowances admissible for inaccuracies and exaggerations of the witness respecting statements made eight years before, there is nothing in what Stevens is reported to have said to him of the mineral richness of the country that can possibly affect the validity of the patent of the government to the patentee, Moyer, of other and different land.

The only other testimony introduced to connect Stevens with the patentee, and to show that Moyer, the patentee, had knowledge of the existence of any lode before his application for the present patent, is that of the witness Norris, who said that, Moyer, the patentee, told him, not stating the time or place, that he, Moyer, was going to get a placer patent for Mr. Stevens, who was afraid that miners would adverse him, and he wanted Moyer to get the patent for him, not mentioning of what land such patent was to be had. It subsequently appeared that this alleged conversation had reference to a different claim than that of Moyer — to that of Wells and Moyer. It would be a waste of time to argue that such statements, if made, do not even tend to prove any such knowledge of a lode within the claim, for a disregard of which in his application one-fifth of the rights acquired by the patent can be defeated, years after the patent has been issued, the property gone into the hands of third parties, who have put up extensive works, and incurred large expenditures in its development. Frail, indeed, would the support of a patent be if testimony to such vague and loose conversations of a party not interested in the land in controversy at the time as owner could be received to impair the title of a *bona fide* purchaser from the patentee of the government, as the plaintiff in this case was. And yet, referring to it, the court below instructed the jury that it tended to prove knowledge of the existence of a lode equally in Moyer, the patentee, as it did in Stevens, thus assuming that it did prove such knowledge by Stevens; that no distinction could be raised between them; and that if the jury found that the existence of a lode was known to Stevens, they might find upon the same evidence that it was known to Moyer, the patentee.

The record in this case affords a good illustration of what may be expected if loose testimony of the character mentioned can be received upon a trial of this kind. It contains a mass of hearsay testimony, irrelevant gossip, geological impressions of the neighborhood, and loose recollections of miners of what had transpired years before or of what they believed to exist, all mingled together and admitted by the court as going to prove the existence of a lode and knowledge of its existence on the part of the placer applicant. If out of such materials a patentee can be deprived of his property years after the issue of a patent, that instrument will be worse than useless to him. It will prove a delusion and a snare, luring him on to large expenditures, only to make more complete his ultimate ruin. It will afford no security against mere surmises, suppositions and beliefs, but leave him to be overwhelmed by them.

In my opinion the judgment should be reversed and a new trial awarded.

---

On the 25th April, 1892, it was " Ordered by the court that the mandate in this cause be stayed; that notice be given to counsel for the defendant in error that an application for a rehearing has been made; and leave is hereby granted counsel on both sides to file printed briefs on or before the first day of the next term of this court upon the question whether a rehearing should be granted and the judgment be reversed and the cause remanded."

---

IRON SILVER MINING COMPANY *v.* MIKE AND STARR GOLD AND SILVER MINING COMPANY. (No. 2.)

BREWER, J. Case No. 3, between the same parties, presents the same questions, and the same judgment of affirmance will be entered therein.

FIELD, J., dissenting. This case presents the same questions which are considered in the case of a similar title, No. 2, just decided, only that the former relates to the Goodell lode claim and the latter to the Gardener lode claim.

The two cases were tried together upon the same testimony, subject to the same objections and exceptions, and the instructions given by the court were so worded as to apply to both. I dissent from the judgment in this case for the reasons expressed in my dissent from the judgment in the former case.

MR. JUSTICE HARLAN and MR. JUSTICE BROWN concur in this dissent.

*Mr. L. S. Dixon* and *Mr. Ashley Pond* for plaintiff in error.  *Mr. James McKeen* and *Mr. Frank W. Owers* were on their brief.

*Mr. T. M. Patterson* for defendant in error.