[No. 1780]

FRANK GOLDEN, RESPONDENT, *v.* J. C. MURPHY, W. BYERS, THE ROYAL MINING COMPANY (A CORPORATION), AND ALFRED CHARTZ, APPELLANTS.

1. MINES AND MINERALS—CLAIMS—RELOCATION.

Where plaintiff and his grantor asserted rights to a mining claim as relocators, on the theory that the claim had been forfeited for failure to perform the required assessment work, they recognized as relocators the prior location, which became forfeited by the relocation.

2. MINES AND MINERALS—CLAIMS—ADVERSE POSSESSION.

A possessor's right to ground covered by a mining claim may be supported by adverse possession alone, whether the land was subject to location as a mining claim.

3. MINES AND MINERALS—RIGHTS ACQUIRED—APEX—EXTRALATERAL RIGHTS.

Adverse possession of a mining claim would give the possessor all ledges or claims apexing within the claim, and the right to follow them within his side lines extended vertically downward.

4. MINES AND MINERALS—LOCATION—TOWN-SITE RESERVATION.

A valid and subsisting mining claim on land covered by a town-site patent at the time the patent was issued does not pass thereunder, nor is the title or right of possession affected thereby, under Rev. St. U. S., sec. 2392 (U. S. Comp. St. 1901, p. 1459), declaring that no title shall be acquired under the foregoing provisions of the chapter to any mine of gold, silver, cinnabar, or copper, or to any valid mining claim, or possession held under existing laws.

5. MINES AND MINERALS—MINING CLAIM—VALIDITY.

A valid mining claim can only be based on a discovery within the limits of a claim, and the existence of minerals in such quantities as to render the land more valuable for mining than for any other purpose, or to justify prudent men in spending their time and money in its exploration and development.

6. CORPORATIONS—FOREIGN CORPORATIONS—APPEARANCE—EFFECT OF SERVICE.

A foreign corporation, served by delivering a copy to the secretary of state, having appeared and answered, could not reserve a question of jurisdiction based on the alleged invalidity of such service.

7. APPEAL AND ERROR—MOTION FOR NEW TRIAL—REVIEW—AFFIDAVITS.
    Affidavits not filed until after the denial of a motion for a new trial for misconduct of parties could not be considered on appeal in reviewing the court's alleged error in denying the motion.

8. NEW TRIAL—MISCONDUCT OF PARTY—FAILURE TO OBJECT.
    Where alleged misconduct of plaintiff's guide in conducting the jury to the mine in controversy for a view was immaterial if defendants' views of the law were sustained, and would probably have been remedied by an instruction by the court if promptly brought to its attention immediately after the jury returned, but was not called to the court's attention until by defendants' motion for a new trial, the court's refusal to grant the motion on that ground, was not error.

9. MINES AND MINERALS—MINING CLAIMS—EXTRALATERAL RIGHTS.
    The rule that extralateral rights cannot exist through a mineralized hanging or foot-wall formation which is sufficiently mineralized to sustain a mining location does not apply where a vein containing valuable ore has well-defined walls, which are of themselves but a part of the mineralized zone which contains ore and veins of quartz sufficiently valuable to support a mining location; such veins being regarded as separate and distinct from the mineralized zone.

10. JUDGMENT—APPLICABILITY TO VERDICT.
    Where, in an action to establish plaintiff's rights in a mining claim, and to recover for the extraction of ore, the evidence showed that only two of the defendants were guilty of such wrongful extraction, the court properly rendered judgment for damages against them only, though the verdict assessed damages against all the defendants.

APPEAL from the District Court of the First Judicial District of the State of Nevada, Lyon County; *John S. Orr,* Judge.

Action by Frank Golden against J. C. Murphy and others. From a judgment for plaintiff, defendants appeal. **Affirmed.** Petition for rehearing. **Denied.**

The facts sufficiently appear in the opinion.

*Alfred Chartz,* for Appellants:

I. The lower court never obtained jurisdiction over the person of the Royal Mining Company. The service of summons upon the Royal Mining Company was a substituted service, made upon the secretary of state, and no personal service was made. (*Harkness* v. *Hyde,* 98 U. S. 476.) This defendant did not waive its rights by its special appearance. (Comp. Laws, 3594; Cal. Code Civ. Pro. 1014; *Powers* v. *Braley,* 75 Cal. 237.)

II.  The verdict and judgment and decree are not supported by any evidence and are contrary thereto, and contrary to each other.  The verdict is for $500 damages against all the defendants, whilst the judgment and decree awards damages against Murphy and Byers only.

III.  The testimony of the miners introduced in evidence on the part of the defendants shows that the formation is very encouraging to coax the miner to extend his time and money in such formation.  But defendants on this appeal are satisfied with the reluctant admission of Mr. Boyle, according to whose testimony the yellow tunnel starts in vein formation, and continues in vein formation down to the stopes and to the ore in dispute, all within the patented ground, and under the decision in *Book* v. *Justice Mining Company* and the Eureka case, and the instructions of the court, no extralateral rights can exist against such formation.  Veins through mineralized zones have no extralateral rights.  The Comstock is a mineralized zone, and adjudicated by this court to be one vein.  The statutes of the United States permits the location of a vein, ledge, lode or mineral deposit, and make no distinction between them, or any of them.  It makes no distinction between the rights of a locator to a seamlet, veinlet, ledge, lode vein or mineral deposit, or whether it is rich or poor, thick or thin, or how it got there.

IV.  Defendants respectfully submit that under the testimony introduced by plaintiff and by his witnesses and by defendants that the formation within which the Canyon and the Table Mountain claims are situated is one big mineralized zone, wider than both locations, and extends both west and east and north and south of them.  Within this formation there are intrusions of what the miners call blue porphyry, and the scientists and geologists who testified gave it no other name.  But the evidence introduced on the part of plaintiff shows that the entire formation is a big mineralized zone, in any part of which the miner finds sufficient encouragement to expend his time and money to explore the same in trying to find pay ore, and within which pay ore is generally found at the blue porphyry intrusions, and the testimony shows with-

out denial that all ore shoots and pay bodies in the dispute at bar were found hugging the blue porphyry intrusions, and all within the patent.

V.  It was incumbent upon plaintiff to show the locators of any claim in 1860 acquired title by location and performing all of the acts and things required to be performed according to the usages, laws and customs of the district embracing the claim, and that the mere introduction of a notice of location made in 1860 in evidence to prove that the same was a valid subsisting claim in 1873 when the patent to Silver City town site issued, is insufficient, because it is absurd to believe or to assume to believe that Silver City District had no customs, usages or laws requiring the performance of labor.  It therefore became incumbent upon plaintiff not only to show a location, and that said location covered the present Canyon mining ground, but also to show that it continued as a located mining claim up to the date of the issuance of the said townsite patent, and that it was at said last-mentioned date known to be valuable for the mineral contained therein.

VI.  In the case at bar it is clearly shown that nothing of value has ever been discovered within the Canyon ground, and that all valuable discoveries have been made since the location of the Canyon, and within the patented lines.  Even conceding for the purpose of the argument only (a thing which we deny to be a fact) that the Richmond Ledge Company was located in 1860, and covered the ground in dispute, and that it was kept alive down to the date of the issuance of the town-site patent, yet, in order to except mines or mineral lands from the operation of a town-site patent, it is not sufficient that the lands do in fact contain minerals, or even valuable minerals, when the town-site patent takes effect; but they must at that time be known to contain minerals of such extent and value as to justify expenditure for the purpose of extracting them.  (*Dower* v. *Richards*, 151 U. S. 663; *Merrill* v. *Dixon*, 15 Nev. 401; Lindley on Mines, sec. 623.)

*James B. Jones*, for Respondent:

I.  The evidence shows, beyond a reasonable doubt, that respondent's ledge, in question, enters the Canyon claim near

the southeast corner and courses through that claim in a northerly direction, and passes out near the center of the north end-line. The evidence shows as convincingly that this ledge continues on its dip down to the ore bodies in question. There can be no possible doubt of this from the evidence in this case. Then there can be no possible doubt about this ledge being identified and traced from its apex to its lowest workings, and to all the workings thereon. We have, then, satisfied the law on this point. From the evidence, this ledge on the surface of the Canyon claim is well defined, with a strong outcrop, and well within the limits of the boundaries of said claim, from the place of entering the same, near the southeast corner, until it passes out near the center of the north end-line. To one trying to partially ascertain the facts there is not a suggestion that this ledge is broader than the Canyon claim, or that its easterly wall outcrops east of the easterly side-line of the Canyon line. That being true, we have a right to follow this ledge on its dip downward. There is not the slightest suggestion that this ledge on its strike runs into the Table Mountain claim in a northeasterly direction, as contended by appellants. The evidence clearly shows that this is not a split ledge with one apex on the Table Mountain.

II.   Having established the existence of the Richmond, as the predecessor of the Canyon, and that the Richmond was located prior to the Silver City town site, the presumption is that the Richmond continued until a change be established by proof, and no such proof appears. Were it otherwise it would not benefit the appellants, as mineral land is not granted to town-site companies. Mining in this state is the paramount industry, and were this action between the respondent and the town-site company, or one holding under it, we assume, and properly, we think, that this court would not hesitate to hold that no mineral rights passed to the town site. But this question does not, and cannot, properly arise herein, for the simple reason, with many others, that this question cannot be raised by any but the town-site company or its successors in interest. No such persons appear in this case. The appellants are contending, because some one else has an alleged

right to oppose respondent's action herein, that they, in the absence of the objection of such party, can interpose it for appellants' benefit. This we contend they have no right to do.

By the Court, NORCROSS, C. J.:

This action was instituted February 18, 1902, against all of the above-named appellants excepting Alfred Chartz. Upon trial had by jury a verdict was rendered in favor of the defendants, and judgment entered accordingly. A motion for a new trial was interposed by the plaintiff, and granted by the court upon the ground that the verdict was not in accordance with the evidence. An appeal was taken to this court from said order, and the same affirmed. (*Golden* v. *Murphy*, 27 Nev. 379.) Upon a second trial of the case with a jury a verdict was rendered upon general and special issues in favor of the plaintiff and for $500 damages, judgment and decree entered accordingly, and for a perpetual injunction. A motion for a new trial was denied. From said judgment and decree, and from the order overruling the motion for a new trial, the case again comes to this court upon appeal.

Prior to the second trial the appellant, Alfred Chartz, having succeeded to the property interests of the defendant Royal Mining Company, was entered as a defendant, and permitted to file a separate answer to the plaintiff's complaint. The action was brought to recover damages in the sum of $7,000 for the extraction of ores by the defendants Murphy and Byers within the exterior lines, extended vertically downwards, of the Table Mountain mine, a patented claim, upon a part of which they held a lease from the then owner, the said Royal Mining Company; also for an injunction restraining the defendants from the further working upon the ledge, which plaintiff alleged has its apex upon the Canyon mining claim, claimed to be the property of the plaintiff. Prior to the second trial all of the defendants filed amended answers, and the plaintiff an amended complaint.

The issues raised by the amended pleadings were the same as at the first trial, with the exception that the defendants by their amended answer attacked the validity of the Canyon mining claim, and hence the right of the plaintiff to base any

extralateral or other rights thereon, by reason of the alleged fact that the ground covered by the said Canyon mining claim was embraced within the original town-site patent of Silver City.

The allegations in the several answers of the defendants respecting the Silver City town site and the invalidity of the Canyon location are as follows: "(a) This defendant denies that plaintiff now is, or ever was, the owner of, or ever entitled to the possession of, the mining claim described in the complaint, situate in the Devil's Gate and Chinatown Mining District, Lyon County, Nevada, or any part thereof. And in connection herewith this defendant avers that in the year 1884 one W. J. Westerfield, being one of the predecessors in interest of plaintiff, made a location of the Canyon mining claim described in the complaint, but that at said date the land upon which said location was made had been conveyed by patent to William Hayden, District Judge of the State of Nevada, Lyon County, as trustee in trust, granting a town site to the inhabitants of Silver City, Lyon County, Nevada, and that such attempted location by said W. J. Westerfield gave him no color of title to said mining claim, or any part thereof, either express or implied, that said Silver City town site was sold by the government of the United States, as aforesaid, on or about June 26, 1868, under the act of Congresss of 1867, and that the declaratory statement was filed on or about December 2, 1867, and that the patent of the United States was issued to said William Hayden in trust as aforesaid, on or about September 20, 1873, and to the successors of said William Hayden, and that on or about May 8, 1876, the successor of said William Hayden sold and conveyed to one Joseph Angell and Joseph Monckton lot No. 268 of said patented town site, and on or about the same day said successor of said William Hayden sold and conveyed to one W. C. Dovey, lots Nos. 267 and 269 of said town-site patent, which said lots cover all of said Canyon mining claim attempted location. (b) Defendants are informed and believe, and upon their information and belief allege the fact to be, that on the date September 20, 1873, being the date of the issuance of the Silver City town-site patent above described, the land described

in the complaint as the Canyon mining claim was not a valid, existing, located mining claim, and that at said date said land was not known to be valuable for its minerals, and that subsequently and on or about the 8th day of March, 1876, one A. W. Piper and T. S. Davenport attempted to make a location of said mining ground, and called it the Richmond G. & S. M. Co., and that said ground at said time belonged to the Silver City town site, and was not locatable, and that on or about the 1st day of January, 1884, said Piper and Davenport abandoned and forfeited their said attempted location, and that two months and twenty-one days thereafter, being on the 21st day of March, 1884, one W. J. Westerfield, predecessor in interest and grantor of plaintiff, Frank Golden, attempted to make a relocation of said Richmond G. & S. M. Co. claim, and after going through the acts of location, called it the Canyon mining claim, and that all such attempted locations and acts are contrary to law, and without right." The only amendment to plaintiff's complaint was in reference to paragraph 3, which, as amended, reads as follows: "That for over ten years immediately preceding the acts hereinafter complained of, the plaintiff and his grantors was the owner of, and entitled to, the possession, and in the quiet and peaceable possession of the said Canyon mining claim, and the ledge thereon."

The allegations contained in defendants' answers relative to the issuance of the town-site patent to Silver City and the subsequent sale and conveyance of lots within said town site covering the land embraced within the boundaries of the Canyon mining claim were established by documentary proof. The record of location of the Canyon mining claim shows that it was located by W. J. Westerfield, March 21, 1884. The record is designated "Notice of Relocation," and in the body thereof the following statement appears: "This is a relocation of the Richmond G. & S. M. claim and shall be known as the Canyon G. & S. M. claim. The said Richmond G. & S. M. claim not having had the necessary amount of labor or improvements made or expended thereon as required by the laws of the United States. This claim is situated in the Devil's Gate and Chinatown Mining District, Lyon County,

State of Nevada." The Richmond G. & S. M. claim is shown to have been located March 8, 1876.

Witnesses upon the part of both the plaintiff and defendants testified to the mining conditions existing in that part of the district embracing the Canyon claim at and prior to the time of the issuance of the town-site patent. The record of two mining locations were admitted in evidence; one the Francis Company O'Connel ledge, covering 800 feet on what was designated as the "O'Connel Ledge," dated August 24, 1860, the other, the "Richmond Company Ledge," dated November 22, 1860, and claiming 1,400 feet of the ledge. A witness for defendants, Thomas P. Mack, testified that he was familiar with all the ground in question since 1863; also that he had been the county recorder for Lyon County for eight years, and that he had searched the records to see if he could find the record of a mining claim covering the same ground as the Canyon claim, and existing at the date of the town-site patent; that he could not find any record that he thought would cover it except that of the said Francis Company O'Connel ledge, which would cover a portion of the claim, the Francis being but 200 feet wide; that he could not tell whether it covered the ledge, part or otherwise. With regard to the record of the Richmond Company ledge, the witness testified that there was nothing in the record whereby he could identify what ground it covered. The witness further testified that the ground covered by the Canyon claim had no reputation as being valuable for mining ground prior to and at the time of the issuance of the town-site patent; that he knew the Francis Company claim did not produce ore.

The following is an excerpt from the testimony of the witness Mack, taken from the transcript:

Q. Was there any ore produced out of claims adjoining? A. I worked some ore from the Silver Leaf, that was, I think at that time—no, it was called the Silver Leaf; that is a relocation of the Fire Ball. I worked some ore from the Silver Leaf for Phillip Geyer about 1871 or 1872, made a small run of ore from the Silver Leaf in 1871 or 1872. It was somewhere from 1869 to 1872 I made a small run for Phillip Geyer.

Q. It would be safe in saying from 1868 to 1872? A. Say from 1868 to 1873.

Q. Now this Silver Leaf is not the same ledge as the Canyon mining claim? A. It is. The Silver Leaf is the old Fire Ball, which the Francis claim was located as adjoining on the south.

Mr. Boyd—Q. It laid to the south of it, did it? A. The Francis lay to the south of the Fire Ball, or Silver Leaf it was afterwards called when it was relocated.

Mr. Mack—Q. Did you mill more than once from the Silver Leaf? A. I think not. I don't recollect making but one milling; possibly I have made more than one.

Q. Did you mill any ore to the west, the western portion of the now so-called Canyon mining claim? A. No. I never milled any ore out of that.

Q. Do you know of any one that did? A. No. * * *

Q. The fact of the matter is, from the time you have known that country from Silver City over to American Flat, it has all been covered with locations, has it not? A. The whole country.

Q. Been claimed as mines by one party and then by another, just the same as any other mining country, has it not? A. Yes. * * *

Q. And all that country, as a matter of fact, from the Comstock, from Virginia City, clear down to Dayton, and from Silver City on to the westward and the American Flat, was all covered with mining locations? A. From Silver City and Virginia City I presume there has been mining locations made two or three deep on that whole country."

The plaintiff called a witness, Peter Brown, who testified that he had resided in Silver City since 1860; that he was acquainted with the country in and about Silver City, "as far as locating claims in early times." The following excerpt is taken from his testimony:

Q. How long have you known that country? A. Well, I have known it since 1860, when I came here. I went around the hills there back of this present quartz mill looking for locations, and could not find any at that time, so I made locations later than that in different places around Silver City,

but I made no locations west, where this suit is at the present time.

Q. You know about the ground now in litigation, do you? A. I know where it lays, of course.

Q. How long have you known that to be located? A. Well, the claim I took ore out of was located in 1864. I took out ore in 1864 from a claim. The ledge is still there today, about fifty feet back from the mill on the edge of the ravine, with a shaft on it. I had ore out of it.

Q. What has been the general reputation of that country as to being mining country? A. All mining country since I came; and the ledge away above that is called the O'Connel, I believe, the Silver Leaf has been relocated. * * *

Q. You took ore out of a big ledge that runs south from the Silver Leaf ledge?. A. Certainly.

Q. That ledge was known, as you understand it, as the Daniel O'Connel ledge, is that right? A. Yes.

Q. At the time you first went to Silver City in 1860 was the country to the west and across that ravine from Silver City—I understood you to say it was all covered with locations? A. That is, as far as I could see, because I went prospecting myself to find locations and could not find one, not right there, but in other parts of Silver City I made some locations later on. * * *

Mr. Boyd—Q. You testified that you knew of that country being located with mining claims in 1860? A. As far as I could see, because I went looking around for locations and could not find one.

Q. Could not find any? A. No; not right there, in back of the mill there, in the neighborhood you are having this suit about now.

Q. Why was it that you could not make a location there then? A. Well, I might have, I don't consider that I am perfect.

Q. I am asking why you could not make a location? A. Because it was all located as far as I could see.

Q. As far as you could see it was all located? A. It was all located; yes, as far as I could see.

Q. Has that country been worked as a mining country since 1860? A. Yes. * * *

Q. Did you know of its being well-known mining ground to the west of Silver City in 1867? A. Certainly.

Q. And in 1868? A. Yes.

Q. And in 1869? A. Certainly.

Q. And in 1870? A. Certainly.

Q. In 1871? A. Yes.

Q. In 1872? A. Certainly.

Q. And in 1873? A. Yes, sir.

Q. And in 1874? A. Yes, sir.

Mr. Thomas Connors, a witness for the plaintiff, testified that he had lived in Silver City since 1868; that he was familiar with the country in and about Silver City; that all the country from the Dayton mine to the Silver Leaf was well-known mining ground when he knew it in 1868, and has been well-known mining ground since that time.

Following the testimony of the witness Connors, the transcript shows the following:

Mr. Boyd—We have one more witness to the same effect— Mr. Wilson. He has been taken very suddenly with a severe illness, and his testimony would be about the same as Mr. Brown's. I think counsel will admit that.

Mr. Chartz—That if present and sworn he would testify that that ground was well-known mining ground.

Mr. Boyd—And that the ledges existing thereon were well-known ledges; that he was familiar with the O'Connel ledge, and also with the ledge subsequently called the Richmond ledge. Those are the two facts, and that those were well-known ledges there I think in 1862 or 1863.

Mr. Chartz—I am not disputing there is a ledge there; it is all ledge. I will admit that if·Mr. Wilson were here present and sworn to testify, that he would testify, as Mr. Connors did, that this was well-known mineral country all through west of Silver City, that there is a ledge known to exist, as Mr. Brown testified, that runs into the old Daniel O'Connel mine, now known as the Silver Leaf, and that it extends down that way towards the south.

Mr. Boyd—And that it was known when it reached in there as the Richmond ledge?

Mr. Chartz—That I do not know; that has not been testified to that it is known as the Richmond ledge.

Mr. Boyd—In the Silver Leaf it was called the O'Connel ledge, south of the Silver Leaf, subsequently located as the Richmond ledge. That is the same ledge, if you will admit that.

Mr. Chartz—By all those names, I don't care what name you call it by.

The map offered in evidence shows that the southerly end-line of the Silver Leaf mining claim is identical with the northerly end-line of the Canyon claim; also that lots Nos. 267 and 268 of the town site covered the southerly portion of this Silver Leaf claim. The town-site patent offered in evidence contains the following reservation: "No title shall be hereby acquired to any mine of gold, silver, cinnabar or copper or to any valid mining claim or possession held under existing laws of Congress mineral surveys, Nos. 44, 45 and 46 as shown on accompanying diagram are specially excluded"— Mineral survey No. 45, therein mentioned, being the said "Table Mountain Claim." The position of counsel for defendants relative to the effect of the Silver City town-site patent upon the validity of the Canyon claim is stated in his brief as follows: "The conclusions of defendants are that the Canyon mining ground was not known to be valuable for its minerals at any time during the application for patent to the Silver City town site down to the date of its issuance, and that any claim that might have been located in 1860 is not identified as covering the present Canyon ground, or any part there, and that the certificate of location introduced in evidence by plaintiff of any location made in 1860 utterly fails to make any such identification, and that said Canyon mining ground cannot be identified therefrom, as shown by the testimony of Mr. Mack."

The record shows without question that the ground embraced within the boundaries of the Canyon claim had been held as a mining claim from the date of the location of the Richmond G. & S. M. claim, March 8, 1876. The plaintiff and his grantor asserted rights to the Canyon claim as a relocation of

the Richmond G. & S. M. claim. As relocators, they recognized the validity of the prior location, which, having become subject to forfeiture, was forfeited by relocation. Plaintiff's right to the ground covered by the Canyon claim, regardless of whether or not it was subject to location as a mining claim, may be supported by adverse possession alone. Such possession would give him all ledges or veins apexing within the boundaries of the claim, and the right to follow them within his side lines, extended vertically downwards, but whether such adverse possession would carry with it extralateral rights, in the event the ground passed to the town site for town-site purposes under its patent, is a question, and one which we do not find to have ever been passed upon.

As the validity of plaintiff's location can be determined upon other facts of the case, we shall not now attempt its solution. If the ground in question never passed under the town-site patent, then it is not questioned but that the plaintiff is entitled to any extralateral rights which he may have established by proof in this case. The reservation in the town-site patent is in accordance with the provisions of the acts of Congress of March 2, 1867, c. 177, 14 Stat. 541, and of June 8, 1868 (chapter 53, 15 Stat. 67), as united and incorporated into section 2392 of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 1459), which reads as follows: "No title shall be acquired under the foregoing provisions of this chapter to any mine of gold, silver, cinnabar or copper, or to any valid mining claim or possession held under existing laws."

Counsel for appellants urges that the evidence shows without conflict that the land embraced within the Canyon claim was not known to be valuable for its minerals prior to, and at the time of, the issuance of the town-site patent, and hence that it passed to the town site under the patent, and, having so passed, no valid mining claim could be initiated thereon. In support of this position counsel cites and relies upon a number of decisions of the Supreme Court of the United States, and particularly the cases of *Davis* v. *Weibbald*, 139 U. S. 520, 11 Sup. Ct. 628, 35 L. Ed. 238; *Dower* v. *Richards*, 151 U. S. 658, 14 Sup. Ct. 452, 38 L. Ed. 395, and *Deffeback* v.

*Hawke*, 115 U. S. 392, 6 Sup. Ct. 95, 29 L. Ed. 423. The cases *supra* were in each instance controversies growing out of conflicting claims to the ground between holders of town-site lots under the town-site patent and mining claimants, whose alleged rights to the ground were in some instances based upon mining locations instituted subsequent to the town-site patent. This case presents a different situation, particularly from the fact that it is not a controversy between the town-site lot owners and a mineral claimant.

A reading of the statute discloses that not only "any mine of gold, silver, cinnabar or copper" is exempted from the provisions of the statutes, but, in addition, the exemption extends to "any valid mining claim or possession held under existing laws." There is evidence in this case that the ground covered by this Canyon location was covered by mining claims as early as 1860, and located and relocated thereafter and held as mining ground ever since. There is evidence to the effect, and counsel for appellant concedes, that the Canyon claim was "well-known mining ground" at the time of the issuance of the town-site patent, but he contends that it was not known to be valuable for mining purposes, and hence would not be exempt from the town-site patent. It is true, however, that the mining claimants have never had their possession disturbed by any one claiming under the town site. The location of the Richmond G. & S. M. claim antedates the sale of the town lots under the town-site patent, covering the same ground, and it does not appear that the town-site lot purchasers ever successfully, or at all, disputed the title of the locators of the mining claim.

We may properly take judicial notice of the fact that the property in question in this suit was in the region of the earliest discoveries of gold in Nevada, a region whose history is part and parcel of the history of the Comstock lode, which in turn is a part of the history of this government, of such importance as to merit recordation, as long as the nation, which the Comstock helped so effectually to maintain, shall last. Into this region, from 1859 until and after the early '70's, came the miners from the "diggings" of California, and other adventurous spirits from all parts of the nation and the

world. Here was a large portion of the country located in
accordance with the customs and rules of the miners, for
there was no other law, prior to 1866, when Congress enacted
the first legislation upon the subject, under the leadership of
that distinguished lawyer, statesman, and citizen of this state,
Hon. Wm. M. Stewart, whose recent death removes the most
conspicuous figure in the mining legislation of this country.

The rights of miners upon the public domain prior to 1866
may be gathered from the following excerpt from the opinion
of Field, J., in *Jennison* v. *Kirk*, 98 U. S. 453, 458, 25 L. Ed.
240: "Until 1866 no legislation was had looking to a sale of
the mineral lands. The policy of the country had previously
been, as shown by the legislation of Congress, to exempt such
lands from sale. In that year the act, the ninth section of
which we have quoted, was passed. In the first section it was
declared that the mineral lands of the United States were free
and open to exploration and occupation by citizens of the
United States, and those who had declared their intention to
become citizens, subject to such regulations as might be pre-
scribed by law and the local customs or rules of miners in the
several mining districts, so far as the same were not in con-
flict with the laws of the United States. In other sections it
provided for acquiring the title of the United States to claims
in veins or lodes of quartz bearing gold, silver, cinnabar, or
copper, the possessory right to which had been previously
acquired under the customs and rules of miners. In no pro-
vision of the act was any intention manifested to interfere
with the possessory rights previously acquired, or which might
be afterwards acquired; the intention expressed was to secure
them by a patent from the government. The senator from
Nevada, Hon. Wm. M. Stewart, the author of the act, in advo-
cating its passage in the Senate, spoke in high praise of the
regulations and customs of miners, and portrayed in glowing
language the wonderful results that had followed the system of
free mining, which had prevailed with the tacit consent of the
government. The Legislature of California, he said, had wisely
declared that the rules and regulations of miners should be
received in evidence in all controversies respecting mining
claims, and, when not in conflict with the Constitution or

laws of the state or of the United States, should govern their determination; and a series of wise judicial decisions has molded these regulations and customs into 'a comprehensive system of common law, embracing not only mining law, properly speaking, but also regulating the use of water for mining purposes.' The miner's law, he added, was a part of the miner's nature. He had made it, and he trusted it and obeyed it. He had given the honest toil of his life to discover wealth, which, when found, was protected by no higher law than that enacted by himself, under the implied sanction of a just and generous government. And the act proposed continued the system of free mining, holding the mineral lands open to exploration and occupation, subject to legislation by Congress and to local rules. It merely recognized the obligation of the government to respect private rights which had grown up under its tacit consent and approval. It proposed no new system, but sanctioned, regulated, and confirmed a system already established, to which the people were attached. (Cong. Globe, 1st Sess. 39th Cong. pt. iv, pp. 3225–3228.) These statements of the author of the act in advocating its adoption cannot, of course, control its construction, where there is doubt as to its meaning; but they show the condition of mining property on the public lands of the United States, and the tenure by which it was held by miners in the absence of legislation on the subject, and thus serve to indicate the probable intention of Congress in the passage of the act."

The following excerpt from the opinion of the court by Mr. Justice Field in the case of *Davis* v. *Weibbald, supra,* will not only show the construction placed by the court of last resort upon the federal statutes relative to town-site patents embracing mineral lands, but will enable us to determine whether the conclusions reached in that case are decisive adversely to plaintiff's title as a mining claimant, under the facts shown in this case, as claimed by appellants' counsel:

"Chapter 8, tit. 32, of the Revised Statutes, contains the law for the reservation and sale of town sites on the public lands. Among other things, it provides for the entry, at the local land office, of any portion of the public lands occupied

. as a town site by its corporate authorities, or, if the town be unincorporated, by the judge of the county court of the county in which the town is situated; the entry to be 'in trust for the several use and benefit of the occupants thereof, according to their respective interests,' and the execution of the trust and the disposal of the lots in the town to be conducted under such regulations as may be prescribed by the legislative authority of the state or territory in which the town is situated. It also provides that the 'entry shall include only such land as is actually occupied by the town, and the 'title to which is in the United States, and declares that, 'where mineral veins are possessed, which possession is recognized by local authority, and to the extent so possessed and recognized, the title to town lots to be acquired shall be subject to such recognized possession and the necessary use thereof,' with the reservation, however, that nothing in the section shall be so construed as to recognize any color of title in possessors for mining purposes as against the United States. By another section of the chapter, and near its close, it is enacted that 'no title shall be acquired' under its provisions 'to any mine of gold, silver, cinnabar or copper; or to any valid mining claim or possession held under existing laws.' (Section 2392.)

"In *Deffeback* v. *Hawke* we said of this statement of the legislation of Congress that it was plain that no title from the United States to lands known at the time of sale to be valuable for its minerals of gold, silver, cinnabar, or copper could be obtained under the preemption or homestead laws, or the town-site laws, or in any other way than as prescribed by the laws specially authorizing the sale of such lands, except in certain states, not affecting the question before us, commenting particularly upon the terms 'known' and 'valuable,' used in connection with the minerals in public lands, implying that they must be of that character to bring the lands within the exception of mineral lands from sale or grant by the · United States. In that case there was no dispute as to the mineral character of the land claimed by the plaintiff under his mining patent, when the town site was entered by the probate judge at the local land office. Proceedings for the acquisition of the mining claim had been previously initiated,

the entry of the same had been had, and payment of the price made to the government, and, when the patent subsequently issued, it took effect by relation at the date of the entry; that being the earliest evidence of any movement for the acquisition of the title of the government.   Here the case is different; here the Butte town site had been entered at the local land office by the probate judge of the county, and the patent of the United States in due form issued to him in trust for the occupants of the town, before the date of the mining patent, or the entry of the mining claim at the local land office, and before that time a deed had been made by the probate judge to the defendant of the premises occupied by him, to recover which the present action is brought.

"When the entry of the town site was had, and the patent issued, and the sale was made to the defendant of the lots held by him, it was not known—at least it does not appear that it was known—that there were any valuable mineral lands within the town site, and the important question is whether, in the absence of this knowledge, the defendant can be deprived, under the laws of the United States, of the premises purchased and occupied by him because of a subsequent discovery of minerals in them and the issue of a patent to the discoverer.   After much consideration we have come to the conclusion that this question must be answered in the negative.   It is true the language of the Revised Statutes touching the acquisition of title to mineral lands within the limits of town sites is very broad.   The declaration that 'no title shall be acquired' under the provisions relating to such town sites and the sale of lands therein, 'to any mine of gold, silver, cinnabar or copper, or to any valid mining claim or possession held under existing laws,' would seem on first impression to constitute a reservation of such mines in the land sold, and of mining claims on them, to the United States; but such is not the necessary meaning of the terms used.   In strictness they import only that the provisions by which the title to the land in such town sites is transferred shall not be the means of passing a title also to mines of gold, silver, cinnabar or copper in the lands, or to valid mining claims or possessions thereon.   They are to be read in connection with the

clause protecting existing rights to mineral veins, and with the qualification uniformly accompanying exceptions in acts of Congress of mineral lands from grant or sale. Thus read, they must be held, we think, merely to prohibit the passage of title under the provisions of the town-site laws to mines of gold, silver, cinnabar, or copper, which are known to exist, on the issue of the town-site patent, and to mining claims and mining possessions, in respect to which such proceedings have been taken under the law or the custom of miners, as to render them valid, creating a property right in the holder, and not to prohibit the acquisition for all time of mines which then lay buried unknown in the depths of the earth. The exceptions of mineral lands from preemption and settlement, and from grants to states for universities and schools, for the construction of public buildings, and in aid of railroads and other works of internal improvement, are not held to exclude all lands in which minerals may be found, but only those where the mineral is in sufficient quantity to add to their richness, and to justify expenditure for its extraction, and known to be so at the date of the grant. There are vast tracts of country in the mining states which contain precious metals in small quantities, but not to a sufficient extent to justify the expense of their exploitation. It is not to such lands that the term 'mineral' in the sense of this statute is applicable.   *   *   *

"On this subject there has been great uniformity of decision by those courts of the states and of the United States which have had the most frequent occasion to consider the subject, and by the land department. It would seem from this uniform construction of that department of the government specially intrusted with supervision of proceedings required for the alienation of the public lands, including those that embrace minerals, and also of the courts of the mining states, federal and state, whose attention has been called to the subject, that the exception of mineral lands from grant in the acts of Congress should be considered to apply only to such lands as were at the time of the grant known to be so valuable for their minerals as to justify expenditure for their extraction. The grant or patent, when issued, would thus be held to carry

with it the determination of the proper authorities that the land patented was not subject to the exception stated. There has been no direct adjudication upon this point by the court, but this conclusion is a legitimate inference from several of its decisions. It was implied in the opinion in *Deffeback* v. *Hawke*, already referred to, and in the cases of the *Colorado Coal & Iron Co.* v *United States*, 123 U. S. 307, 328, 8 Sup. Ct. 131, 31 L. Ed. 182, and *United States* v. *Iron Silver Mining Co.*, 128 U. S. 673, 683, 9 Sup. Ct. 195, 32 L. Ed. 571.     *   *   *

"In connection with these views it is to be borne in mind, also, that the object of the town-site act was to afford relief to the inhabitants of cities and towns upon the public lands by giving title to the lands occupied by them, and thus induce them to erect suitable buildings for residence and business. Under such protection many towns have grown up on lands which, previously to the patent, were part of the public domain of the United States, with buildings of great value for residence, trade, and manufacture. It would in many instances be a great impediment to the progress of such towns if the title to the lots occupied by their inhabitants were subject to be overthrown by a subsequent discovery of mineral deposits under their surface. If their title would not protect them against a discovery of mines in them, neither would it protect them against the invasion of their property for the purpose of exploring for mines. The temptation to such exploration would be according to the suspected extent of the minerals, and, being thus subject to indiscriminate invasion, the land would be to one having the title, poor and valueless, just in proportion to the supposed richness and abundance of its products. We do not think that any such results were contemplated by the act of Congress, or that any construction should be given to the provision in question which could lead to such results. Our conclusion, as already substantially stated, is that Congress only intended to preserve existing rights to known mines of gold, silver, cinnabar, or copper, and to known mining claims and possessions, against any assertion of title to them by virtue of the conveyances received under the town-site act, and not to leave the titles of purchasers on the town sites to be disturbed by future discoveries.

"In *Deffeback* v. *Hawke* the mining patentee's rights antedated those of the occupants under the town-site law, and, wherever such is the case, his rights will be enforced against the pretensions of the town-site holder; but, where the latter has acquired his rights in advance of the discovery of any mines and the initiation of proceedings for the acquisition of their title or possession, his rights will be deemed superior to those of the mining claimant. It is not necessary in this case to state in what manner it must be shown that the existence of mines was known at the time the patent for the town site was issued. If the mining patent states any initiatory steps in acquiring title which antedates the title of the town site, that may suffice in an action at law. In the absence of such statement the development and working of a mine would be a controlling fact; so, also, perhaps would be the location of the claim patented, and notice thereof required by law, or the custom of miners. But in this case the patent does not show any such initiatory steps; it merely refers to the entry of the mining claim, and that was after the patent was issued to the town site. No proof was offered to show when the mining claim was originally located; and it does not appear that the want of it was made an objection to the plaintiff's recovery, except as that may be implied from the defendant's offer to prove that, at the time the patent to the Butte town site was issued to the probate judge, the premises embraced by the Gold Hill lode were not known to be valuable for minerals of any kind. That proof was excluded on the ground that the mining patent to the plaintiff established that the premises contained valuable minerals. Such was the effect of the patent, if there were any jurisdiction in the land department to issue a mining patent at all under the circumstances of this case. Assuming, for the present, that there was jurisdiction, the question was not whether there were valuable minerals at the time that patent was issued, but whether such minerals were known to exist within the premises at the date of the town-site patent to the probate judge. The plaintiff not having offered any proof upon this point, but having relied upon the fact as a matter of presumption merely, the defendant should have been permitted

to establish the negative of it.   The absence of any proceedings required by law or the custom of the mining district to initiate a right to a mining claim, which he might perhaps have shown, would have been very persuasive that no mine was then known to exist.   We think that the court erred in excluding the proof of the defendant.   * * *

"Proceedings for the acquisition of title to a mining claim within a town site, commenced before the issue of a town-site patent, could undoubtedly be prosecuted to completion afterwards.   The right initiated by the location of the mining claim would not be defeated by a subsequent conveyance of the title to the land in which the mining claim was situated. But it is not perceived where the jurisdiction exists under the laws of the United States to grant a patent for a mine on lands owned by private individuals—which was the case here—if the lots for which defendant received a deed were included within the town-site patent, and the location of the mining claim was subsequently made.   * * *   They (town-site patents) are conclusive in such actions of all matters of fact necessary to their issue, where the department had jurisdiction to act upon such matter, and to determine them; but, if the lands patented were not at the time public property, having been previously disposed of, or no provision had been made for their sale, or other disposition, or they had been reserved from sale, the department had no jurisdiction to transfer the land, and their attempted conveyance by patent is inoperative and void, no matter with what seeming regularity the forms of law have been observed.

"In the several cases to which we have been referred in the fifth and sixth Montana Reports (*Silver Bow Mining and Milling Co.* v. *Clark*, 5 Mont. 378, 5 Pac. 570; *Talbott* v. *King*, 6 Mont. 76, 9 Pac. 434; *Butte City Smokehouse Lode Cases*, 6 Mont. 397, 12 Pac. 858), which involved contests between parties claiming under mining patents, and others claiming under town-site patents, and in which very able and learned opinions were given by the Supreme Court of the Territory of Montana, the mining claim patented had been located, and the rights of the mining claimant had thus attached, before the town-site patent was issued.   The patent which subse-

quently followed was a mere perfection of the right originated by the location, and to which it took effect by relation. It was held, in accordance with this opinion, that the prior mining location was not affected by the town-site entry."

See, also, *Iron Silver Co.* v. *Mike & Star Co.*, 143 U. S. 394, 12 Sup. Ct. 543, 36 L. Ed. 201; *Dower* v. *Richards*, 151 U. S. 658, 14 Sup. Ct. 452, 38 L. Ed. 305; *Noyes* v. *Mantle*, 127 U. S. 448, 8 Sup. Ct. 1132, 32 L. Ed. 168.

It is clear from the language used in the statute, and from the opinions expressed by the Supreme Court of the United States, particularly in the *Davis* v. *Weibbald* case, *supra*, that land, held as a valid and subsisting mining claim at the time of the issuance of the town-site patent, does not pass under such patent, nor is the title or right of possession of the location at all affected thereby:

"As said in *Belk* v. *Meagher*, 104 U. S. 279, 283, 26 L. Ed. 735: 'A mining claim perfected under the law is property, in the highest sense of that term, which may be bought, sold, and conveyed, and will pass by descent.' It is not, therefore, subject to the disposal of the government." (*Noyes* v. *Mantle*, 127 U. S. 353, 8 Sup. Ct. 1134; 32 L. Ed. 168.)

"A valid mining claim can only be based upon a discovery within the limits of the claim, and the existence of mineral in such quantities as to render the land more valuable for mining than for any other purpose, or as will justify a prudent man in the expenditure of time and money in its exploration and development." (Lindley on Mines, sec. 176.)

It may be seriously questioned whether a discovery, sufficient to support a valid mining location so as to exempt such location from the provisions of a town-site patent, could be held to the same degree of strictness as would be required in the case of a mine known, or claimed to be known, to exist at the time of the issuance of such town-site patent, but which had not previously been located. In the case at bar, while it appears that the ground embraced within the Canyon claim was sold as town lots under the town-site patent, it does not appear that the lot purchasers ever acquired, or attempted to acquire, possession from the claimants to the ground under prior existing mining locations. The evidence is

conclusive, we think, that the ground covered by the Canyon claim has been held as a valid and subsisting mining claim, from a time long prior to the date of the town-site patent down to the present. No one in a position to question the right of the plaintiff, his grantor, and prior locators of the ground covered by the Canyon claim to hold the same as mining ground, has ever established, or attempted to establish, so far as the record shows, a superior right to the ground. Under this state of facts it follows as a matter of law that the Canyon mining claim is a valid mining claim unaffected by the town-site patent.

2. It is contended by counsel for appellant that the court never acquired jurisdiction over the defendant the Royal Mining Company, and hence that the judgment is void as against such defendant. This contention is based upon the fact that such defendant is a foreign corporation, and that no valid service or process was had upon it. It appears that this defendant did not have an agent residing in the state, and that service was made upon the secretary of state, under a provision of our statute relative to service of foreign corporations doing business in this state, and which have not a resident agent upon whom process may be served. It appears that the company appeared specially, and moved to quash the service of summons. This motion was denied, after which the company filed an answer to the complaint and participated in the trial, but sought to reserve the question of service. We think by answering to the merits the defendant waived any question of service, and that it could not at the same time answer and reserve a question of jurisdiction based upon a matter of service of process. (*Curtis* v. *McCullough*, 3 Nev. 202; *Higley* v. *Pollock*, 21 Nev. 198; Comp. Laws, 3594.)

3. *Irregularity of the Adverse Party:* One of the grounds of the defendants' motion for a new trial is alleged irregularity of the adverse party. Upon the conclusion of the taking of testimony the record shows the entry of the following order: "By agreement of both parties the order is entered by the court that the jury be taken to view the premises described in plaintiff's complaint, and that Mr. J. C. Murphy on the part of the defendants, and Mr. Emmet Boyle on the

part of the plaintiff, accompany the court and the jury, and
point out such places as the court may direct; the expense
of conveying the court and jury to and from the ground to be
borne by both parties." Prior to the submission of the cause
to the jury the attention of the court was not called to any
alleged irregularity upon the part of the plaintiff or jury dur-
ing their visit to, and inspection of, the premises involved
in the suit. After the verdict was rendered and judgment
entered, and in support of defendants' motion for a new trial,
the affidavit of the said defendant J. C. Murphy was filed,
charging the said Emmet Boyle with making many state-
ments and arguments to the jury while investigating the
premises in pursuance of the order of the court, and which
were made contrary to the provisions of said order. Further,
that upon the street in Silver City he drew a diagram of the
properties, "and argued to the jury that plaintiff's claim was
on the hill, and defendants' claim was in the canyon below
the hill," which was not true, except to the extent of showing
that "the Canyon claim lies above defendants' claim, thus
arguing that the apex must necessarily be within the Canyon
ground."

The affidavit contains the following charges in reference to
the conduct of Mr. Boyle, while the jury was inspecting the
mining properties involved in the suit: "That soon thereafter
said jury went upon said ground, and entered the tunnel
referred to in the testimony as the yellow tunnel, marked
upon the map 'Tunnel 27 feet above main tunnel,' and affiant
and some of the jurors went down the Murphy winze at the
end of said tunnel to the ore stopes, and said Boyle remained
in said tunnel with others of the jurors, and affiant could hear
said Boyle talking to said jurors, but do not know what was
said, and soon thereafter the remaining of said jurors and said
Boyle reached the bottom of said winze, and said Boyle called
the attention of said jurors to what he called the 'hanging
wall' of said Canyon vein; and gave his reasons why the same
was the hanging wall of said Canyon vein. He said, among
other things, that taking the pitch of the said wall at said
place, the same would come out on the Canyon ground; that
at and about said point said formation has many different

pitches, and that said Boyle took a pitch favorable to plaintiff, but taking other pitches at or about the same point said vein and formation would apex on the Table Mountain patent. * * * That from the bottom of said Murphy winze said Boyle said, in substance and effect, 'Now, gentlemen, I will take you from this point to the surface of the Canyon, all the way in ledge,' and in going through to the surface of the Canyon he remarked to the jury, 'This is all in ledge,' and argued the testimony on the part of defendants, as introduced through Mr. Osmont, that a certain place on the way was a foot wall. On reaching point 'L' on the map said Boyle, in the presence of said jury, said, 'Now, Murphy, Osmont has admitted this is the foot wall, and it is in evidence, and you can't dispute it.' * * *" From said point L the jury proceeded on the main tunnel level, being tunnel A, and at a point near said point L and southwesterly therefrom there is a filled tunnel, and said Boyle said, with reference thereto: 'If you could get in there, you would see the foot wall is back in there.' * * * From said point L said jury proceeded westerly and southerly on said tunnel A, and during the progress thereof said Boyle remarked and argued to said jury that they were proceeding in ledge all the way. That on reaching a certain stope in the Canyon ground, being the first stope lying west of tunnel A traveling southwesterly from point L, said Boyle remarked and argued to the jury that he could take them up to the surface of the Canyon ground on the foot wall of the ledge. * * * That from the stope last mentioned said jury went to point N on the main tunnel level, and to what plaintiff claims is the hanging wall through which tunnel O breaks, and at said point where plaintiff claims is the hanging wall of said Canyon vein, said Boyle remarked and argued to the jury, in substance as follows: 'Gentlemen, this is tunnel O, from which Ed Powers [who had testified on behalf of defendant] said all of the rock that came out of this tunnel was milled, and you can plainly see by examination that there is nothing but country rock showing in there.' That * * * said jury never went through said tunnel O to its portal. That subsequently said jury went to the surface on the Canyon ground, and Judge Orr complained of being exhausted, and remained

behind, and said Boyle insisted on said jury going through
tunnel Q and back into the mine, and that in said tunnel Q,
and without the presence of said judge, said Boyle remarked
and argued to the jury, 'Now, gentlemen, you can see this is
the same broad vein, and here is the stope, and now from this
point I can take you down through and all the way to the
ores in dispute in vein matter, all the way.' That said jury
proceeded on said way until they reached a point near
Murphy shaft No. 2, when said Boyle remarked that said jury
were still in Canyon ground, when in fact they were in Table
Mountain ground  *  *  *  That from thence said jury pro-
ceeded to climb up and through Murphy shaft No. 2 to the
surface, and at a point about eleven feet from the bottom
of the shaft, said Boyle remarked and argued to said jury in
substance as follows: 'Gentlemen, this is the hanging wall of
the Canyon ledge, and from here up it doesn't amount to any-
thing.' That  *  *  *  from thence on they simply climbed
the ladder way, and paid no attention to the formation, but
looked out for their own safety in climbing said ladders.
*  *  *  That upon reaching the surface at the top of
Murphy's shaft No. 2 said Boyle asked said jury to go to
point marked 108 feet above main tunnel level, and about one-
half of them went in, and the others refused to go in, and he
explained to those that went in that said tunnel at said point
was in the croppings of said Canyon ledge."

We have omitted from the affidavit, *supra*, all allegations
which are the mere conclusions of the affiant. There was no
counter-affidavit filed prior to the hearing of the motion for a
new trial, and the question presented rests solely upon the suf-
ficiency of this affidavit. After the decision of the trial court
denying the motion for a new trial, a further affidavit was
filed by Mr. Chartz, himself a defendant, and also the attor-
ney for the defendants. After the appeal was perfected, an
affidavit by Mr. Boyle was filed. We have not been advised
upon what theory counsel expected that these affidavits could
be considered, and it is too manifest for argument that they
cannot be noticed upon this appeal.

The trial court, in passing upon the motion for new trial,
concerning the question presented by the affidavit, said: "The

representatives of the respective parties were to point out to
the jury the different places in and about the mining prem-
ises, concerning which testimony had been given by the
respective witnesses. The court also accompanied the jury,
but in passing through the different tunnels and drifts the
members of the jury in examining the premises were not
always entirely together, and the court did not remain in the
mines during the entire time which the jury were there; and,
while the court does not recollect of hearing any of the par-
ticular statements alleged to have been made by Boyle, as
stated in the affidavit of Murphy, or similar statements, still
it is entirely possible for any or all of such statements to have
been made without the hearing of the judge who presided at
the trial. The judge was also not with the members of the jury
for a brief time after the arrival of the jury at Silver City, and
therefore the diagram alleged to have been made by Boyle on
the street of Silver City could have been made without the
knowledge of the presiding judge. The court does not hesi-
tate to say that, if the statements were made by Boyle, as
alleged in Murphy's affidavit, the same was improper, as was
also the drawing of the diagram, and it was the duty of the
defendant Murphy, upon the return of the jury to the court-
room, to have called to the attention of the court the alleged
misconduct of the said Boyle, in order that the court might
have an opportunity to have called the same to the attention
of the jury, and give them the proper instructions in reference
to disregarding all such alleged statements or misconduct,
and, if such statements and misconduct were true, to have
adjudged the said Boyle in contempt of court. However, the
said defendant Murphy evidently chose to remain quiet and
take the chance of a favorable verdict, and keep the miscon-
duct of the said Boyle in reserve. The statements in the
affidavit as to the jury being influenced by the statements or
misconduct of Boyle are not supported by the affidavits of
any of the jurors, or any other persons, and are mere conclu-
sions of the affiant. Furthermore, the alleged statements of
Boyle are in general conformity to his testimony given during
the trial, and, the parties failing to bring this matter to the
attention of the court before the rendering of a verdict, which

they had ample opportunity to do, in the opinion of the court it now comes too late, and that they have waived their right to now complain in reference to the alleged misconduct of the witness Boyle."

That the affidavit of J. C. Murphy charges conduct upon the part of Mr. Boyle that was highly improper there can be no question. It appears, however, that the affiant frankly admits that, in a measure at least, he sought to do the same thing by attempting to show the jury "his views, but was utterly unable to cope with said Boyle in said matter." In the absence of a showing that Mr. Murphy called his counsel's attention promptly to the irregularity, one is naturally impressed that he did not, at the time, consider it a serious matter. It is not charged in the affidavit that the statements of Boyle were not in accordance with his testimony given upon the witness stand, and the opinion of the trial court is that "the alleged statements of Boyle are in general conformity to his testimony given during the trial." This view of the trial court has not been attacked in appellants' brief. After the decision of the trial court denying the motion for a new trial, counsel for defendants and appellants filed an affidavit setting forth that he was not informed by Mr. Murphy of this matter until after the verdict and judgment, and hence had not opportunity to combat it. As we have before stated, we are unable to see how we could give this affidavit any consideration, and counsel has failed to point out any authority for its consideration. Certainly neither the trial court nor opposing counsel had any opportunity to consider this latter affidavit.

"It is part of the moving party's case to show want of knowledge. The moving party must show affirmatively that neither he nor his counsel had knowledge of the irregularity in time to avoid its consequences, and that they were not guilty of negligence in failing to make proper inquiry." (Hayne on New Trial and Appeal, sec. 27, subd. 3, p. 101.)

"The party affected by an irregularity should bring the matter to the attention of the court in time to admit of its correction, if possible; otherwise it is waived. *The general rule:* The rule does not mean (at least in California) that there

must be a formal objection or exception, such as is required for the review of 'errors in law.' Its foundation is that, where the consequences of an irregularity might have been avoided if the attention of the court had been called to the matter at the proper time, it would be unjust to permit the party to take his chances of a favorable verdict, keeping in reserve the power to obtain a new trial, if the verdict should be unfavorable. By silence after knowledge of the occurrence the party is held to have impliedly consented to it, and to have waived all objections which may exist in connection with it. This principle is of extended operation, and it is applied in almost every stage of judicial proceedings. So infinitely numerous and complex are the possible combinations of circumstances during the progress of a cause that without the healing operation of the rule in question there would be few verdicts that would stand. The rule is well established, and its operation is illustrated by numerous decisions." (Hayne, *supra*, subd. 1, pp. 98, 99.)

"Another rule generally applicable to irregularities relates to the conduct of the party himself who claims to have been injured by the irregularity alleged. He must show that there has been no delay on his part in seeking a correction of the evil or a removal of its effects; and, if this can be accomplished by bringing it to the attention of the court, that should be done at the earliest possible moment. Failure to do so as soon as practicable will be construed as amounting to acquiescence and waiver of the right to complain. Herein the courts enforce, in cases to which it is applicable, an equitable estoppel. In other words they hold that it would be inequitable to permit a party to remain silent, having knowledge of an act or episode pending or during the trial which might prejudicially affect him, taking the chances of a favorable decision, and after an unfavorable decision taking advantage of his knowledge, ofttimes exclusive, to deprive the opposite party of its benefits." (Spelling on New Trial and Appellate Proc. sec. 62.) See, also, Bayles on New Trials and Appeals, p. 590; 17 Am. & Eng. Ency. Law, 2d ed. p. 1206; *Wood* v. *Moulton*, 146 Cal. 317, 80 Pac. 92.

It does not appear from the showing that this is a case

within any exception to the rule, for it cannot be said, we think, that had the matter been called to the attention of the court promptly, any injury, possibly inflicted, could not have been remedied. Counsel for appellants' main contention upon the merits of this case is that, as a matter of law, deduced from the testimony of all the witnesses, both for the plaintiff and the defendant, extralateral rights cannot exist where the formation is as described by the witnesses. The statements of Boyle, made to the jury while viewing the premises, could scarcely have had any effect upon this contention; for, if appellants' view of the law is correct, such statements would have been immaterial. In so far as they might have had any effect in convincing the jury that the Canyon claim possessed a vein distinguishable from the formation which comprised its walls, and which, upon its dip, passed across the side lines, extended vertically downwards, of the patented claim, the court, upon the matter having been promptly brought to its attention, could doubtless have remedied the matter; at least we cannot say that it could not. The affidavit being insufficient under the authorities quoted, the court did not err in denying a new trial upon this ground.

4. The contention of counsel for appellant that the verdict is not supported by the evidence requires no extended consideration at this time, in so far as the evidence itself is concerned. The position of counsel in regard to the evidence is substantially the same as that taken upon the former trial, and which was extensively considered upon the former appeal. It is sufficient now to observe that it cannot be said that there is not substantial evidence to support the verdict, unless we agree entirely with appellants' position upon the law. Counsel for appellants contends, as a matter of law, that "no extralateral right can legally exist through a mineralized hanging and foot-wall formation, which is sufficiently mineralized to sustain a mining location, and to induce the miner and prospector to expend his time and money in the exploration thereof, even though scientists and geologists and hired experts might find sufficient provocation to swear that they detect walls to any formation which they call an independent vein coursing through such mineralized formation." We do

not think counsel's contention can be supported as an inflexible rule of law. We think that counsel fails to distinguish between what is sufficient in the law to constitute a discovery sufficient to support a valid location of a mining claim and what constitutes a vein having defined walls, and to which extralateral rights attach. If we understand counsel correctly, he takes the position that there is no distinction, and in this we think he is in error. Suppose a vein containing valuable ore has well-defined walls, which are themselves but a part of a mineralized zone, which carries small values, and which in places contains seams of quartz sufficiently valuable to support a mining location, can it be said that such vein cannot be regarded as separate and distinct from the mineralized zone? We think it cannot be so said. What may constitute a discovery sufficient to validate a location may be, and frequently is, a very different thing from what constitutes an apex of a vein which will entitle the owner thereof to extralateral rights.

In the case of *Grand Central Mining Co.* v. *Mammoth Mining Co.*, 29 Utah, 490, 575, 83 Pac. 648, the Supreme Court of Utah, after quoting definitions from the Eureka case, 4 Saw. 302, Fed. Cas. No. 4,548, *Iron Silver Mining Co.* v. *Cheesman*, 116 U. S. 529, 6 Sup. Ct. 481, 29 L. Ed. 712, and *United States* v. *Iron S. M. Co.*, 128 U. S. 673, 9 Sup. Ct. 195, 32 L. Ed. 571, by Bartch, C. J., said: "In all these definitions, as will be noticed, the essential elements of a vein are mineral or mineral-bearing rock and boundaries, and no doubt that, when one of these elements is well established, 'very slight evidence may be accepted as to the existence of the other.' It would seem, therefore, that where one claims extralateral rights under the acts of Congress, because of a vein existing and apexing in his ground, but which has no well-defined boundaries, he, when his claim is controverted, must, in order to exercise such rights, show a ledge or body of mineral or mineral-bearing rock of such value as will distinguish it from the country rock, or from the general mass of the mountain. The material must in texture and value be such as to show the existence of a vein, and the mere fact, as has been stated, or proof of the fact, that the rock is broken, shattered, and

fissured and mixed with calcareous substance, though it may show a conglomerate mass, does not establish, in the sense of the statutes, a vein. When, however, the walls or boundaries are well defined, the vein differentiated from the adjacent country, and the kind of material mentioned constitutes the filling, evidence of slight value in mineral will, it seems, be sufficient.

"It is insisted for the appellant, however, that 'a lode, within the meaning of the statute, is whatever the miner can follow with a reasonable expectation of finding ore,' that though he sees no ore, yet if he sees gangue and vein matter, he discovers the lode, and that whatever material would be sufficient to render valid a location thereon would be sufficient evidence of apex to justify one in following therefrom downwards, beyond the side lines of the location, in the same kind of material, to and beneath the surface of his neighbor's property. We do not thus interpret the law. What may constitute a sufficient discovery to warrant a location of a claim may be wholly inadequate to justify the locator in claiming or exercising any rights reserved by the statutes. What constitutes a discovery that will validate a location is a very different thing from what constitutes an apex, to which attaches the statutory right to invade the possession of and appropriate the property which is presumed to belong to an adjoining owner. The question of a sufficient discovery of a vein, or of the validity of a notice of location, upon which the cases cited by the appellant on this point are authority, is substantially different from one relating to the continuity of a vein on its dip from the apex, and which tests the rights of the undisputed owner of the surface to what lies underneath and within his own boundaries. It is the object and policy of the law to encourage the prospector and miner in their efforts to discover the hidden treasures of the mountains, and therefore, as between conflicting lode claimants, the law is liberally construed in favor of the senior location; but, where one claims what *prima facie* belongs to his neighbor, because of an apex in the claimant's location, a more rigid rule of construction against the claimant prevails, and, as we have already observed, he has the burden to show, not merely that the vein on its dip may

include the ore bodies in the adjoining ground, but that in fact it does so include them. Until he establishes such fact beyond reasonable controversy he has no rights outside his side lines in another's ground.

" 'In determining what constitutes such a discovery as will satisfy the law and form the basis of a valid mining location, we find, as in the case of the definition of the terms "lode" or "vein," that the tendency of the courts is toward marked liberality of construction where a question arises between two miners who have located claims upon the same lode, or within the same surface boundaries, and toward strict rules of interpretation when the miner asserts rights in property which either *prima facie* belongs to some one else, or is claimed under laws other than those providing for the disposition of mineral lands, in which latter case the relative value of the tract is a matter directly in issue. The reason for this is obvious. In the case where two miners assert rights based upon separate alleged discoveries on the same vein neither is hampered with presumptions arising from a prior grant of the tract, to overcome which strict proof is required. In applying a liberal rule to one class of cases and a rigid rule to another the courts justify their action upon the theory that the object of each section of the Revised Statutes, and the whole policy of the entire law, should not be overlooked.' (1 Lindley on Mines, 2d ed. sec. 336.)

"The Supreme Court of Montana, in *Fitzgerald* v. *Clark*, 17 Mont. 100, 42 Pac. 273, 30 L. R. A. 803, 52 Am. St. Rep. 665, observed: 'When it is said that a location may be sustained by the discovery of mineral deposits of such value as to at least justify the exploration of the lode in the expectation of finding ore sufficiently valuable to work, it is a very different question from telling a jury that the geological fact of the continuity of the vein to a certain point may be determined by what a practical miner might do in looking for some hoped-for continuity.' (*Migeon* v. *Montana Cent. Ry. Co.*, 77 Fed. 249, 23 C. C. A. 156; *Bonner* v. *Meikle*, 82 Fed. 697: *United States* v. *Iron Silver Mining Co.*, 128 U. S. 673, 9 Sup. Ct. 195, 32 L. Ed. 571.)

"Reverting to the characteristic of a vein or lode, appearing

from the definitions above quoted, that its filling must consist of a body of mineral or mineral-bearing rock, what value such material should contain is a matter not devoid of difficulty, and no standard of value applicable to all such cases has yet, and probably never will be, devised. It must necessarily depend upon the characteristics of the district or country in which the vein or lode, in any particular instance claimed to exist, is located, and upon the character, as to boundaries, of the vein itself. If the country rock, or the general mass of the mountain outside of the limits of the vein, is wholly barren, slight values of the vein material, as before stated, would seem to satisfy the law; but if, on the other hand, the rock of the district generally carries values, then undoubtedly the values in the vein material, where the boundaries of the vein are not well or not at all defined, either on the surface or at depth, should be in excess of those of the country rock, else there can be no line of demarcation, nor, where the rock is generally broken, shattered, and fissured, anything to separate it from the adjacent country. Values, therefore, of the filling of a vein, must be considered with special reference to the district where the vein or lode is found. It is likewise as to a definition of a vein or lode. In *Migeon* v. *Montana Cent. Ry. Co.*, 77 Fed. 249, 23 C. C. A. 156, it was said: 'The definition of a lode must always have special reference to the formation and peculiar characteristics of the particular district in which the lode or vein is found.' (*Bonner* v. *Meikle, supra.*)"

The mineral zone in question in this case is described as country rock cut by a series of independent ledges of an approximately parallel dip, any one of which ledges has its entire system of walls. Within this country rock comprising the mineral zone, at "wide intervals, as you would find in the bedding and cracks of any rock," are found "quartz seamlets." The fact that the Canyon ledge passes through a mineral zone of this character does not, we think, make it an inseparable part of the general mass of rock comprising the zone, but, upon the contrary, that it may be regarded separate and distinct therefrom, and may be followed upon its dip. In the former appeal of this case, we said: "If small pieces of quartz,

narrow seams, and little pockets of ore embodied in porphyry be deemed sufficient to sustain a location, we do not understand that they give the owner any greater rights against veins apexing on other claims dipping under this ground than he would have if his location were based upon a substantial and well-defined ledge."

5.  The contention of counsel for appellants that: "The verdict and judgment and decree are not supported by any evidence, and are contrary thereto, and contrary to each other in this: The verdict is for $500 damages, and against all the defendants, whilst the judgment and decree awarded damages against Murphy and Byers only"—is, we think, not well taken. We think the lower court had power to enter up a judgment and decree in accordance with the proofs, which showed, without contradiction, that all damages for the wrongful extraction of ore was occasioned by the defendants Murphy and Byers, and not by the other defendants in the action. Had the judgment for such damages been entered against all of the defendants, we would have had power, upon this appeal, to have modified the judgment in the form in which it was entered in the lower court, and it would have been our duty to have done so.

The record contains a number of other assignments of error, but the view which we have taken upon the main questions heretofore considered makes it, we think, unnecessary to consider them.

The judgment and order appealed from are affirmed.

### ON PETITION FOR REHEARING

By the Court, NORCROSS, C. J.:

Counsel for appellants has filed a petition for a rehearing in which he contends that this court should consider the affidavit of Alfred Chartz, filed after the motion for a new trial had been determined in the lower court, because there was no suggestion of diminution of record or motion to strike, and that both parties impliedly agreed that the court should consider the affidavits filed, which are conceded to be *dehors* the record; also that the conclusion reached by this court on

the town-site question is contrary to the decisions of the Supreme Court of the United States cited by us in support of the opinion heretofore rendered.

Our former ruling, that the affidavit referred to cannot be considered upon the appeal is abundantly supported by numerous decisions of this court. (*Simpson* v. *Ogg*, 18 Nev. 28; *Marshall* v. *Golden Fleece M. Co.*, 16 Nev. 156; *State* v. *McMahon*, 17 Nev. 365; *State* v. *McLane*, 15 Nev. 345, 371.)

Upon the town-site question, the petition does not present any points not thoroughly covered by the original brief. On account of the importance of the question, however, we have again carefully considered the decisions of the Supreme Court of the United States and others not cited, and we are still of the opinion that the conclusions heretofore reached are not in conflict with the decisions of the Supreme Court of the United States, but are in harmony therewith.

The petition is denied.